THIRD DIVISION
DECEMBER 23, 2009

No. 1-07-0410

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 29532 |
| | ) | |
| CHRISTOPHER MOORE, | ) | Honorable |
| | ) | John J. Fleming, |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE COLEMAN delivered the opinion of the court:

Christopher Moore was convicted by a jury of first degree murder and armed robbery and sentenced to consecutive 30-year and 6-year terms of imprisonment as a result. In the instant appeal, he contends that: (1) the trial court's denial of his request for a one day continuance violated his due process right to present evidence in his defense; (2) the prosecution's improper comments and misstatements of the evidence in opening and closing argument denied him a fair trial; (3) the trial court improperly imposed a consecutive sentence on the armed robbery count on the basis of a presumption that the jury's general verdict represented a finding that he was guilty of a more culpable homicide than felony murder; and (4) his trial counsel was ineffective in failing to tender jury verdict forms specifying the basis for the murder verdict, thereby allowing an improper conviction of armed robbery in addition to a felony murder conviction based upon the same offense. We affirm.

BACKGROUND

Tayaab Larry was attacked in a Chicago park on July 25, 2004, and died of his injuries on August 2. Khalia Wright testified that as of the night of the attack, she was involved with Moore, and that she had previously dated Larry. On the night of the attack, Wright and a friend, Jillian Griffith, agreed to go out with Larry and one of his friends, Jermaine Williams. Larry and Williams picked up Wright and Griffith in Williams' red Chevrolet, and the four eventually drove to a park. Wright testified that a group of men entered the park, that the men approached the two couples, and that the couples walked away from the men and toward the car. Wright heard a thump, turned toward the sound, and saw Larry on the ground and a man standing over him with a baseball bat. At trial, Wright identified Moore as the man with the bat. She had not mentioned Moore when first questioned by police about the incident and testified that she had not originally identified him because she had been afraid, although she also testified that Moore had not threatened her or asked her to conceal his involvement. Wright testified that she had seen Moore the day after the attack, and that Moore told her that he and his friends had followed her the night before and had seen her kiss Larry in the park.

Jillian Griffith's trial testimony was similar to Wright's. She was in the park, walking away from the group of men who had approached them, when her attention was drawn to the group behind her by a loud sound. She saw Larry on the ground and a man holding a bat. Like Wright, she did not implicate Moore in the attack when first questioned by police, but identified him as the man with the bat in later questioning and at trial. Griffith also saw Moore going through Larry's pockets while Larry was on the ground.

Jermaine Williams testified that he was with Tayaab Larry, Khalia Wright and Jillian Griffith in the park when they were approached by a group of seven or eight men. Jermaine saw one of the men take a full swing with a baseball bat and strike Larry in the back of the head. Larry fell immediately, and Williams saw the attacker strike him with the bat four more times as he was on the ground. Williams testified that the bat-wielder and others in the group then attacked him, and that he was knocked down and kicked, but was able to run away from them without suffering serious injury.

Williams said that he owned the car that the couples rode in, but that Larry had driven to the park and kept the keys in his pocket. When Williams returned to the park after the attack, the car was gone, and he reported it as stolen. Police saw Williams' car on July 30, 2004, and stopped it. Antonio Nettles was driving the car and Dante Myles was a passenger. The police returned the car to Williams, and he found two items inside that did not belong to him: a cell phone later proved to belong to Myles and an Illinois Department of Corrections form that appeared to have been issued for Nettles.

Dante Myles testified that on the night of the incident, he saw Moore hit Larry with a baseball bat. He said that no one else present at the time had a bat. A few days later, Myles saw Moore driving a red Chevrolet that he had not seen him drive before. Myles asked if he could drive the car, Moore gave him the keys, and Myles drove the car and returned it. He later saw Antonio Nettles driving the car. Myles admitted that when he was first questioned by police, he had untruthfully denied being present at the time of the attack.

Antonio Nettles testified that he was shooting dice in the park on the night of the incident when he was approached by Moore and a group of men. Moore said that he was planning to rob

3

"his girlfriend's new boyfriend." Nettles continued his dice game while the group left the park and then returned. He was still playing dice when he heard a loud sound from about 30 feet away. When he looked toward the source of the sound, he saw a man on the ground and Moore standing over him with a baseball bat.

Lovell Polk testified that he saw Moore in the park on the night of the incident, that Moore asked him to "sucker punch" someone, and that Moore pointed out the intended target. Polk said that he punched the man and knocked him down and that Moore struck the man while he was on the ground. Polk further testified that Antonio Nettles gave Moore a baseball bat, and that Moore hit the man with the bat three times. Polk also saw Moore search Larry's pockets.

Polk had originally been charged with first degree murder in Larry's homicide and had denied involvement in the crime. He testified against Moore as part of an agreement that included a plea of guilty of conspiracy to commit murder and a seven-year prison sentence for that offense. Polk had claimed that he was beaten by police officers while in custody, but explained at trial that the abuse had prompted him to tell the truth about the incident and that he had withheld the facts because he had been threatened by Moore.

An additional witness, Frederick Louis, testified that he was in the park at the time of the incident. Louis saw Polk punch a man in the face, and then saw Moore take a bat and hit the man in the head. Another witness, Milton Presle , testified that Moore, Nettles, Louis and some other men visited him at an apartment across the street from the park on the night of the attack. Presley testified that after the men left, he could see from the apartment's window that a group of people were fighting in the park. Presley said that he did not see Moore with a bat and that he did not see Moore strike anyone. The parties stipulated that Presley had given a different account of the

night's events when questioned by the police. According to the stipulation, Presley had told police that Moore had come to his apartment with a bat, that Moore had said that the man who was involved with his girlfriend was in the park across the street, and that he had seen Moore hit a man three times with a bat while the man was on the ground. The stipulation further provided that Presley told police that Moore later bragged about beating Larry. Desmond Mitchell testified that Moore had come to his apartment on the night of the attack and asked him for help in fighting someone who was "messing with his girl." Mitchell did not accompany Moore, but Moore told him later that he had punched a man in a fight and knocked him out.

Moore, who was arrested in Detroit on October 4, 2004, presented three witnesses in his defense. Patricia Felder testified that she was a friend of Moore's family and that she had known him since he was five or six years old. She said that she and Moore worked together on the renovation of an apartment in Detroit in June, July and August 2004 and that she had seen him almost daily during that period. She said that Moore was playing cards with her and her family in Detroit on the night of July 25, 2004, that they played into the next morning, and that she also saw Moore in Detroit at about 2 p.m. on July 26. Moore's mother, Crystal Thomas, testified that he had left Chicago for Detroit on June 6, 2004, and that to her knowledge, he did not come to Chicago from June to August.

Dominique Brown testified that she was Khalia Wright's friend and Moore's ex-girlfriend. She said that she was visiting Wright on July 23 or 24, and that Wright's cousin, Walt, was also present. Brown heard Wright tell her cousin that Larry was a stalker, that he would not leave her alone, and that she wanted him gone. Wright's cousin had a bat at the time, and Brown believed that he had beaten Larry at Wright's request.

Moore sought to have the trial continued for one day to allow the testimony of Brandy Alexander. Moore's counsel advised the court that the defense had purchased an airline ticket to bring Alexander from Detroit at the end of the day on November 30, 2006, that she was scheduled to stay in Chicago overnight, and that the defense was prepared to call her to the stand on the morning of December 1. The court denied Moore's motion, and the case was submitted to the jury on November 30. The jury was instructed that it could find Moore guilty of first degree murder if it found that if he intended to kill Larry or do him great bodily harm; if he knew that his actions created a strong probability of death or great bodily harm to Larry; or if he killed Larry in the course of an armed robbery. The jury returned a verdict of guilty of first degree murder on a general verdict form for that offense, and also found Moore guilty of armed robbery. The court sentenced him to a 30-year prison term for murder and a consecutive six-year prison term for armed robbery. This appeal followed.

## ANALYSIS

### I. Denial of Motion for Continuance

Moore contends that the trial court improperly denied his motion for a continuance, and that this denial violated his right under the due process clauses of the United States and Illinois constitutions to present evidence in his defense. On Wednesday, November 29, 2006, Moore's counsel advised the court that he had witnesses prepared to testify and that he expected one of them to be present in court on Friday, December 1. The court responded, "I wasn't going to do testimony on Friday. This was going to end Thursday at the latest."

On Thursday, November 30, before the presentation of testimony, defense counsel advised the court:

"We have three witnesses here who are ready to testify. The problem is the fourth witness, Mr. [sic] Brandy Alexander, indicated to my investigator and to myself last week that she would be here. In anticipation that [the prosecutor] would end State's case on Thursday, Ms. Alexander arranged to be here first thing Friday morning to testify coming in on a flight tonight. We sent her a ticket. We have lodging for her. Problem is State ended yesterday, Judge. So although I am ready to go forward with three witnesses today I would be asking for the case to be held over until tomorrow so the fourth witness, Ms. Alexander, to [sic] come."

Counsel for the prosecution commented, "Judge, from the beginning of this trial when we talked to the jurors, you said on the outset Friday would be the date this trial ends on the outset."

The court stated:

"As I said, at the latest we are going to – if worse came to worst, we were going to argue Friday morning. I don't like to do evidence on Friday and then send them out on a Friday. So now here we are Thursday. The State I remember saying they were thinking they would be Wednesday or Thursday that they would be finished. Okay. So they finished yesterday. Everyone knew who the witnesses were and stuff. I have told the jury that now we are probably going to finish up today and argue today, so I am going to do three short witnesses and send them home for today and come

back tomorrow and argue on a Friday. No, I'm not going to do that.

I'm sorry but when I started on Monday I indicated that all we would

do is argue if we had to go on Friday."

The court denied the motion for a continuance.

The defense renewed the motion after the testimony of its three scheduled witnesses. The court asked defense counsel whether Alexander would be "another alibi witness to testify defendant was in Detroit," and counsel answered, "Yes." The court concluded, "It would be repetitive. There was plenty of notice to the trial schedule, and I am sorry. But I am not delaying the whole schedule of the trial because you failed to get your witness here." The trial court then denied a defense motion for a mistrial.

In our view, the desire to adhere to a predetermined schedule was not a proper basis for the denial of the brief continuance requested by Moore in the instant case. "Speedy administration of justice is desirable, but the desire for speed must not be allowed to impinge upon the constitutional requirement of a fair opportunity to defend." People v. Shrum, 12 Ill. 2d 261, 265 (1957). The trial court explicitly accepted the possibility that the proceedings would extend to Friday, December 1 for closing argument and jury instructions. The record reveals no basis for the court's refusal to allow the same extension of its schedule to permit Moore to present an alibi witness.

However, our disapproval of the court's action does not compel reversal of Moore's conviction. In reviewing the trial court's denial of Moore's motion, we must consider: (1) whether the defendant was diligent in attempting to secure the presence of the witness; (2) whether the defendant has shown that the testimony of the witness was material and might have affected the

verdict; and (3) whether the defendant was prejudiced by the exclusion of the testimony.  People v. Ward, 154 Ill. 2d 272, 307 (1992).

In People v. Sargent, 184 Ill. App. 3d 1016 (1989), this court emphasized that a defendant seeking review of the denial of a motion for a continuance could not demonstrate the materiality of the witness or the prejudice from the exclusion of her testimony in the absence of an offer of proof that detailed the substance of the proposed testimony.  "A defendant seeking a continuance to secure the presence of a witness must make an offer of proof of that witness' proposed testimony.  ***  The court has no way of knowing the materiality of testimony sought to be introduced without an offer of proof, even if it is told by counsel that the proposed evidence is in the nature of corroboration of an alibi."  Sargent, 184 Ill. App. 3d at 1022-23.  In the instant case, Moore did not make an offer of proof.  He did not specify the nature of Alexander's proposed testimony in a motion for new trial or otherwise.  As a result, the record is devoid of any showing that Alexander's testimony would have been material and non-cumulative, or that its exclusion would have been prejudicial.  In the absence of this showing, the denial of a continuance to permit her testimony cannot require reversal of Moore's conviction.

II.  Prosecution Comments

Moore argues that various prosecution comments during opening statement and closing argument denied him a fair trial.  The first such statement identified by Moore was a remark during opening that Moore gave Williams' car to Dante Myles in exchange for Myles' silence about the attack: "As you will hear, from Danta [sic] Myles, that car was given to him, just a few days after that as a gift by Christopher Moore.  I have no doubt that was a gift for his silence."  The prosecution returned to the subject in closing: "You heard from Dante and Antonio as well

9

about this defendant, Chris Moore, driving around in that car and giving that car to them to Dante and Antonio a few days after that. A gift, maybe sharing in the proceeds, maybe trying to insure their silence." A defense objection interposed at this point was overruled. Moore correctly notes that there was no testimony that he gave the car as a gift or that he used it to buy the silence of Myles or Nettles. Citing People v. Linscott, 142 Ill. 2d 22, 30 (1991), Moore asserts that these comments were improper in that they overstated the evidence against him. He also argues that the prosecutor's statement of personal belief that the car was a gift was improper. See People v. Lee, 229 Ill. App. 3d 254, 260 (1992) ("It is prejudicial error for the prosecutor to express personal beliefs or opinions, or invoke the integrity of the state's attorney's office, to vouch for the credibility of a prosecution witness").

Moore also cites as improper the prosecution's statement that Jermaine Williams was "100% sure" in identifying him as the bat-wielding attacker; its claim, without apparent evidentiary support, that Jillian Griffith was so afraid of him that she moved out of the neighborhood, and its assertion that he had attacked Larry in front of "like 20 people."

Prosecution comments in opening statement or closing argument do not require reversal if they do not result in "substantial" prejudice. People v. Kliner, 185 Ill. 2d 81, 127-28 (1998). Moore's convictions in the instant case cannot properly be reversed in the absence of a determination that the comments at issue had a substantial impact on the jury's verdicts. We do not believe that the record supports the conclusion that the cited comments impacted the jury's verdict.

Two of the comments at issue made only collateral suggestions of Moore's guilt. The prosecution's statements regarding Moore's supposed gift of Williams' car to Dante Myles were apparently intended to demonstrate that Moore attempted to conceal his actions, while the

assertion that Jillian Griffith relocated because of her fear of Moore portrayed him in a decidedly negative light. But neither statement related to the primary evidence of Moore's guilt: the multiple testimonials to his efforts to recruit allies in his planned attack on Tayaab Larry and the several eyewitnesses to the attack and its immediate aftermath, the majority from individuals who knew Moore prior to the incident. In light of this evidence, we cannot conclude that the jury's verdict was in any way the result of the prosecution's unfounded claims that he tried to buy the silence of one witness or that another feared him. Similarly, we do not believe that the prosecution's brief and isolated characterization of the certainty of Jermaine Williams' testimony, even if inaccurate, outweighed the jury's own assessment of that testimony. We reject the assertion that these comments resulted in prejudice to Moore.

The prosecution's reference to Moore's attack occurring in the presence of "like 20 people" is, in our view, a fair comment on the evidence presented. Jermaine Williams testified that seven or eight men approached his group of four in the park. Antonio Nettles testified that at the time of the incident, he was removed from the groups containing Larry and Moore, gambling on a dice game. Since the prosecution's comment was an explicit approximation, we conclude that it was fairly supported by the evidence of the number of people in the park at the time of the incident. In summary, we hold that none of the comments made by the prosecution in opening or closing merit reversal of Moore's conviction.

### III. Absence of Separate Murder Verdict Forms

The jury was instructed that it could find Moore guilty of first degree murder if it found that he had intended to kill, if he committed acts that he knew created a strong probability of death or great bodily harm, or if Larry was killed in the course of Moore's commission of an armed

11

robbery. The defense did not object to this instruction, nor did it offer specific murder verdict forms for submission to the jury. The jury returned a general verdict of guilty of both first degree murder and armed robbery. Moore argues that the general murder verdict cannot be presumed to represent a finding that he was guilty of either intentional or knowing murder, and that in the absence of such presumption, the jury's verdict must be considered a finding on the felony murder charge. As a result, Moore argues that his conviction and sentence for armed robbery, a lesser included offense of his murder, must be vacated. People v. Smith, 183 Ill. 2d 425, 432 (1998).

Moore's argument ignores the long-standing "one-good-count" rule, which provides that a general verdict of guilty on a multiple-count indictment is interpreted to be a finding of guilt on each count. People v. Lymore, 25 Ill. 2d 305, 307-08 (1962). When, as in the instant case, the jury has been instructed on intentional, knowing, and felony murder and returns a general verdict of guilty of first degree murder, the one-good-count presumption results in a determination that the defendant has been found guilty of the most culpable mental state, intentional murder. People v. Cardona, 158 Ill. 2d 403, 411-12 (1994); People v. Thompkins, 121 Ill. 2d 401, 455-56 (1988).

The one-good-count rule has consistently been interpreted to permit a defendant found guilty of murder by a general verdict to receive enhanced sentencing based upon his presumed guilt of intentional murder even where the enhancement could not have been based upon a felony murder conviction. In People v. Baker, 127 Ill. App. 3d 565 (1984), the defendant was convicted of murder by a general verdict and also convicted of home invasion; he received consecutive sentences for the two offenses. 127 Ill. App. 3d at 566. The defendant contended that his home invasion conviction, as a lesser included offense of his felony murder, could not stand. 127 Ill. App. 3d at 569. This court held that the jury's general verdict was construed as a guilty verdict on

the intentional murder charge, held that the defendant's home invasion conviction was not a lesser included offense of intentional murder, and affirmed the convictions and consecutive sentences for murder and home invasion.  127 Ill. App. 3d at 569.

In People v. Sample, 326 Ill. App. 3d 914 (2001), the defendant was found guilty of first degree murder, armed robbery, and home invasion and received consecutive sentences for each offense.  326 Ill. App. 3d at 916.  The murder conviction was based upon a jury's general verdict after being instructed on intentional and felony murder, and the defendant sought vacation of his armed robbery and home invasion convictions as lesser included offenses of the felony murder. This court rejected the defendant's contention.

> "In this case, defendant was charged with and the jury was instructed on both intentional murder and felony murder.  Defense counsel did not object to the submission of a general verdict form nor is there any evidence in the record that counsel tendered alternative verdict forms requiring the jury to find him guilty or not guilty of felony murder.  The State's proof was applicable to both charges and the jury returned a general verdict of guilty of first degree murder.  The most serious of the first degree murder charges in this case is the one with the most culpable mental state: intentional murder.  Cardona, 158 Ill. 2d at 411.  Under Cardona, therefore, this charge was the appropriate basis for sentencing.
>
> Although defendant is correct that armed robbery and home invasion are lesser included offenses of felony murder, neither is a

lesser included offense of intentional murder. Thus even if the consecutive sentences would have been inappropriate for a specific verdict on felony murder, the 'good count' of intentional murder renders the sentences proper." Sample, 326 Ill. App. 3d at 929, *appeal denied*, 198 Ill. 2d 629 (2002).

In People v. Griffin, 375 Ill. App. 3d 564 (2007), the defendant argued that a general verdict of guilty on a murder charge could not also support an additional sentence for armed robbery, a lesser included offense of the charged felony murder. This court rejected that argument, holding that "the most serious first degree murder charge, intentional murder, was the proper basis for sentencing." 375 Ill. App. 3d at 571-72. The court held that the defendant's convictions for murder and armed robbery required consecutive sentences; accordingly, it vacated the concurrent sentences imposed by the trial court and remanded for the imposition of consecutive sentences. 375 Ill. App. 3d at 573-74.

Moore argues that our supreme court's recent decision in People v. Smith, 233 Ill. 2d 1 (2009), prohibits the use of a general murder verdict to support his conviction and sentence for armed robbery. In Smith, the court reviewed convictions and sentences imposed in addition to convictions of first degree murder based upon general verdicts. The court held that "where, as here, specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." Smith, 233 Ill. 2d at 23. Moore asserts that Smith prohibits use of the one-good-count rule where its application could result in adverse sentencing consequences for the defendant.

We do not share Moore's interpretation of Smith. Although portions of the Smith opinion suggest disapproval of the use of the one-good-count rule to subject a defendant to more severe sentencing, the court's discussion is clearly dependent on the case's procedural context: the trial court denied the defense request to submit separate verdict forms to the jury. The Smith court repeatedly noted this context: "it is a violation of due process to deny a defendant the opportunity to have the jury decide his theory of defense" (233 Ill. 2d at 23); "because the presumption that arises from application of the 'one good count rule' could work a prejudice against [defendants] at sentencing, the presumption cannot substitute for the jury's actual findings, *at least where defendants have requested that the jury make specific findings with regard to the degree of the offense* (emphasis added)" (233 Ill. 2d at 23); "the trial courts erred when they refused defendants' requests for separate verdict forms (233 Ill. 2d at 23)."

The significance of this procedural context has been confirmed by the supreme court. In People v. Davis, 233 Ill. 2d 244 (2009), the court distinguished Smith: "The present case is a world away from Smith. Here, defendant did not object to the general verdict form and did not request a special verdict form. Again, the holding of Smith was conditioned on the trial court's refusal to grant such a request and did not establish a rule that the court must act *sua sponte* to give a specific verdict form. Additionally, defendant is challenging the validity of the one-good-count rule, something which was expressly not done in Smith." Davis, 233 Ill. 2d at 273.

Baker, Sample, and Griffin demonstrate that the one-good-count principle has long been employed to permit enhanced sentencing, including the imposition of consecutive sentences for additional felonies, by construing a general first degree murder verdict as a finding of guilt on an intentional murder charge. We believe that this use of the principle is among the corollary rules

explicitly left undisturbed by Smith.  The Davis court's discussion of Smith demonstrates that  the distinguishing factor entitling the defendant to relief from the application of the one-good-count principle in Smith was the request for separate verdict forms at trial, not the mere possibility that the principle would subject him to increased punishment.  Accordingly, we reject Moore's argument that he is entitled to the relief granted in Smith because he, like the defendant there, received consecutive sentences, while the defendant in Davis did not.  Since Moore did not request separate verdict forms in the instant case, we hold that Smith offers no support for his assertion that the general murder verdict could not support his armed robbery conviction.

In addition to its confirmation of the continued validity of the one-good-count principle, the Davis court also explained that even if the application of the principle were improper, any resulting error "did not amount to a structural defect that required automatic reversal."  Davis, 233 Ill. 2d at 273.  The court based its analysis upon the United States Supreme Court's recent opinion in Hedgpeth v. Pulido, 555 U.S. ____, 172 L. Ed. 2d 388, 129 S. Ct. 530 (2008) (*per curiam*). "Relying upon analogous cases, the Supreme Court in Pulido easily concluded that in cases where a jury is instructed on multiple theories of guilt, one of which is improper, a harmless-error analysis is applicable.  Pulido, 555 U.S. at ___, 172 L. Ed. 2d at 391, 129 S. Ct. at 532."  Davis, 233 Ill. 2d at 270 (citations omitted).  The Davis court held that one-good-count issues are subject to plain error analysis on review if the defendant did not object to the use of a general verdict form at trial.  233 Ill. 2d at 273.  Under plain error review, "the defendant has the burden to persuade the court that the error was prejudicial, that is, defendant must show that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him."  233 Ill. 2d at 274.  The Davis court held that the evidence of the defendant's commission of intentional or

knowing murder was sufficiently strong to compel the conclusion that he was not prejudiced by the failure to present separate murder verdict forms to the jury. 233 Ill. 2d at 273-74.

The Davis court's plain error analysis is readily applicable to the instant matter. Several witnesses testified to the premeditated nature of Moore's attack on Tayaab Larry. Two trial witnesses and one pretrial witness account reported Moore's hostility toward Larry because of their competing relationships with Khalia Wright. Four separate witnesses testified that Moore struck Larry with a bat; one of the witnesses, Jermaine Williams, specified that Moore took a full swing with the bat and struck Larry in the head. Proof of such action establishes the intent to cause death or great bodily harm necessary to support a conviction for first degree murder. People v. Foster, 119 Ill. 2d 69, 87-88 (1987). We hold that the evidence of Moore's intent to cause death or great bodily harm to Larry was clearly sufficient to permit the jury to return a guilty verdict on both intentional murder and knowing murder charges. Accordingly, we cannot conclude that the jury, if permitted to specify the basis for its murder verdict, would have returned a not guilty verdict on the intentional murder and knowing murder charges. We find that Moore has failed to demonstrate that the lack of specific verdict forms produced the verdict against him and that he has failed to make the showing of prejudice necessary for a reversal under plain error review.

## IV. Ineffective Assistance of Counsel

Our conclusion that Moore has not demonstrated the prejudicial impact of the absence of separate verdict forms also dictates our disposition of his contention that his counsel's failure to submit separate forms was impermissibly deficient. When a defendant is unable to show a reasonable probability that the correction of counsel's alleged deficiencies would have produced a different result, his ineffective assistance claims fail. People v. Enoch, 122 Ill. 2d 176, 201-02

(1988). We hold that Moore has not shown a reasonable probability that separate verdict forms would have resulted in not guilty verdicts on the intentional murder and knowing murder charges. As a result, we reject his assertion that his counsel's deficiencies require reversal of his convictions or modification of his sentences.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINN, J., specially concurs.

THEIS, J., dissents.

JUSTICE QUINN, specially concurring.

I completely concur with Justice Coleman's majority opinion. I write separately because I believe that Justice Theis' dissent raises several important issues.

As a member of the panel that wrote both People v. Smith, 372 Ill. App. 3d 762 (2007) (Smith I), and People v. Titus, No. 1-05-1523 (2007) (unpublished order under Supreme Court Rule 23) in the appellate court, I am familiar with its holding. We concluded:

> "[W]e hold that when a defendant who is charged with
>
> intentional or knowing murder and felony murder requests a
>
> separate verdict form for felony murder and such a request has a
>
> basis in the evidence presented at trial, the separate verdict form
>
> must be given or consecutive sentences cannot be imposed based on
>
> the offense underlying the felony murder, pursuant to section 5-8-
>
> 4(a) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West
>
> 2004)." Smith, 372 Ill. App. 3d at 771-72.

The supreme court affirmed. In doing so, the court considered and rejected the State's argument that the error was harmless because the evidence that the defendants were guilty of intentional murder was "overwhelming." People v. Smith, 233 Ill. 2d 1, 25 (2009). In People v. Thurow, 203 Ill. 2d 352, 363 (2003), the court explained the harmless error standard as "the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error," citing Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828 (1967). In Glasper, our supreme court affirmed the defendant's conviction, rejecting the defendant's argument that the trial court's refusal to question a jury venire regarding the fact that

they could not hold a defendant's failure to testify against him, as required under Supreme Court Rule 431 (b)(4) (pre-amended version) prejudiced the defendant. The court found that "no rational juror would have acquitted defendant of the offenses for which he was charged" and "[t]he evidence of defendant's guilt is overwhelming." Glasper, 234 Ill. 2d at 202. By their holding in Smith, the supreme court recognized that applying the harmless error analysis as defined in previous cases would not provide a basis for relief from the error in Smith as there was no question that the defendant was guilty of both first degree murder and the underlying forcible felonies. The State had objected to the defendants' requests for separate verdict forms in both Smith and Titus and the circuit courts agreed, thus preventing defense counsel from arguing that, if the defendant was guilty of first degree murder, he was guilty only under a theory of felony murder. This would have precluded the circuit courts from sentencing the defendants to consecutive sentences on the underlying forcible felonies.

The Smith court explained: "Whether the trial courts' refusal to submit separate verdict forms can be deemed harmless error is not a question that may be resolved by looking at the strength of the evidence. The refusal to submit separate verdict forms is harmless error only if the jury's findings may be ascertained from the general verdicts entered." Smith, 233 Ill. 2d at 25.

After discussing the instructions provided to the defendants in Smith, the court held:

"We conclude that where, as here, it is impossible to tell

from the general verdict whether defendant was actually convicted

on each count in the indictment, it is error for the trial courts to

make that presumption. Therefore, in the cases at bar, because

defendants were sentenced based on the presumption that they were

found guilty of intentional murder, defendants were prejudiced and the trial court's error in refusing the defendants' tender of separate verdict forms cannot be deemed harmless error." (Emphasis omitted.) Smith, 233 Ill. 2d at 27-28.

The dissent cites the above language and the language in Glasper characterizing the holding in Smith as an example of "structural" error in support of Justice Theis' position that "the type of error involved in Smith continues to be error and continues to be an automatically reversible error not subject to harmless error analysis." Slip op. at 33.

The above quoted language from Smith makes it clear that "the error in Smith" was the refusal of the defendant's request to submit separate verdict forms. This fact is also supported by the four quotes from Smith in the majority opinion (slip op. at 13-14), all of which refer to Smith's holding as being premised on the refusal of the defendants' requests for specific verdict forms. While Glasper did characterize the holding in Smith as "structural" (Glasper, 234 Ill. 2d at 192), Glasper in no way suggested that the holding in Smith imposed a *sua sponte* duty on trial courts to provide specific verdict forms rather than a general verdict form in first degree murder cases. Glasper did not refer at all to the court's holding in Davis and how that holding impacted, if at all, on the holding in Smith.

The reason for this is clear. As the court in Davis explained: "We find Smith inapplicable to the present case." Davis, 233 Ill. 2d at 271. Consequently, I disagree with the dissent's characterization that "The majority seems to suggest that Davis overrules Smith insofar as Smith held that the refusal to allow a special verdict where it could result in an increased sentence for the defendant could never be harmless error." Slip op. at 32.

In addition to the language from <u>Davis</u> found in the majority opinion, the court also said:

"This court in <u>Smith</u> affirmed the murder conviction, but vacated the conviction and sentence for attempted armed robbery. In so doing, this court's holding was narrow: 'where, as here, specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided <u>upon request</u> and the failure to provide them is an abuse of discretion.' (Emphasis added.) <u>Smith</u>, 233 Ill. 2d at 23." <u>Davis</u>, 233 Ill. 2d at 272.

In discussing the holdings in <u>Smith</u> and <u>Davis</u>, the question before this court is a simple one: which case is applicable to the facts of our case? The defendant in the instant case did not object to the general verdict form. This is consistent with the factual scenario addressed in <u>Davis</u> and is inapposite to the factual scenario in <u>Smith</u>. The dissent asserts that "The error here was the same error as the error in <u>Smith</u> insofar as the defendant was denied the opportunity to have the jury determine whether he was guilty of intentional murder, which resulted in a potentially erroneous consecutive sentence for armed robbery. See <u>Glasper</u>, 234 Ill. 2d at 192." Slip op. at 36. Again, the alleged error in this case, the failure of the trial court to *sua sponte* provide the jury with separate verdict forms, is not the same error as the error in <u>Smith</u>, which was the refusal of the trial court to provide separate verdict forms when requested to do so by the defendants.

As the dissent points out, the federal courts have limited "the type of errors which are considered to be 'structural' to the denial of the right to counsel, the denial of the right to self-representation, the denial of a right to a public trial, and the denial of the right to trial by jury

resulting from the giving of a defective reasonable doubt instruction." Slip op. at 31-32; United States v. Gonzalez-Lopez, 548 U.S. 140, 149, 165 L. Ed. 2d 409, 420, 126 S. Ct. 2557, 2564 (2006). Glasper characterized the error in Smith as "structural" under this last type of error. This means that Glasper reaffirmed the holding in Smith that when the trial court refuses to provide separate verdict forms when requested to do so by the defendant, it is always reversible.

The dissent also asserts "under Smith, I would find that it was plain error for the court to have not given the jury special verdict forms." Slip op. at 36. The Smith court, however, had no occasion to consider whether the second prong of plain error analysis applied since there was no plain error, the defendant having requested the specific verdict forms. Further, as explained by our supreme court, plain error is not in itself a "standard of review" as there is no trial court order to review in the plain error context. People v. Herron, 215 Ill. 2d 167, 184-85 (2005).

The dissent also asserts that "Davis has altered the plain error analysis to be applied under Illinois law." Slip op. at 33. I agree with this proposition to the extent that Davis adopted Hedgpeth v. Pulido's holding that "alternative theory error" and most other instructional errors are subject to a harmless error analysis. Davis, 233 Ill. 2d at 270-71. This is significant in that Pulido made clear that errors based on those in Stromberg v. California, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931) and Yates v. United States, 354 U.S. 298, 1 L. Ed. 2d 1356, 77 S. Ct. 1064 (1957) are no longer automatically reversible. Hedgpeth v. Pulido, 555 U.S. ___, ___, 172 L. Ed. 2d 388, 391, 129 S. Ct. 530, 532 (2008). While Smith did rely on Stromberg and Yates, in part, I do not believe that the result in Smith is now called into question. Pulido arose in the context of a review of the granting of *habeas corpus* relief to the defendant for his state conviction. The Ninth Circuit Court of Appeals held that the jury instruction error was a "structural error." Davis, 233

Ill. 2d at 269, citing Pulido v. Chrones, 487 F.3d 669 (9th Cir. 2007), and Pulido, 555 U.S. at ___, 172 L. Ed. 2d at 390, 129 S. Ct. at 530,   In Danforth v. Minnesota, 552 U.S. 264, ___, 169 L. Ed. 2d 859, __, 128 S. Ct. 1029, 1041 (2008), the Supreme Court explained that cases involving federal *habeas* relief have a "unique context" and that states may provide broader relief than that available through *habeas* proceedings.  "[The federal] interest in uniformity, however, does not outweigh the general principle that States are independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on federal constitutional guarantees."  Danforth, 552 U.S. at __, 169 L. Ed. 2d at ___, 128 S. Ct. at 1041.

I believe that there are still differences between plain error analysis in Illinois and the federal courts.  In People v. Herron, 215 Ill. 2d at 186, our supreme court rejected the State's request that they explicitly adopt the federal standard for plain error, even though they noted that the court had often employed it, notably in the cases finding that Apprendi errors were subject to harmless error analysis.  Herron, 215 Ill. 2d at 182-83, citing People v. Crespo, 203 Ill. 2d 335, 348 (2001).  Also see People v. Thurow, 203 Ill. 2d 352, 363 (2003); People v. Nitz, 219 Ill. 2d 400, 415-16 (2006).

While plain-error review is similar in both the state court and federal court contexts, there are differences.  In Puckett v. United States, 556 U.S. ___,  173 L. Ed. 2d 266, 129 S. Ct. 1423 (2009), the United States Supreme Court explained that federal " 'plain-error review' - involves four steps, or prongs.  First, there must be an error or defect - some sort of '[d]eviation from a legal rule' - that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant. [Citation.] Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. [Citation.] Third, the error must have affected the appellant's substantial rights,

which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings.' [Citation.] Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error - discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " (Emphasis in original) Puckett,556 U.S. at ___ , 173 L. Ed. 2d at 274-75, 129 S. Ct. at 1429.

The third prong of the federal plain error analysis defines "affected the appellant's substantial rights" as "affected the outcome of the district court proceedings." This is analogous to a requirement of prejudice, which as the dissent correctly asserts, is not needed in the second prong of Illinois' plain error analysis.

Another difference is found in Pulido's language, "Neder makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.' " Pulido, 555, U.S. at ___ , 172 L. Ed. 2d at 391-92, 129 S. Ct. at 532, quoting Neder v. United States, 527 U.S. 1, 11, 144 L. Ed. 2d 35, 48, 119, 199 S. Ct. 1827, 1834 (1999). The court in Smith held: "the general verdicts finding defendants guilty of first degree murder that the juries returned in these cases are entirely valid. There is no legal basis for setting defendants' murder convictions aside. Accordingly, the problem presented here is solely one of how to interpret the verdicts for purposes of sentencing." Smith, 233 Ill. 2d at 28. As our supreme court refused to apply a harmless error analysis to the error in Smith even though the murder verdicts were valid, the court has not adopted the holding in Neder in all circumstances.

Further, in Glasper, while our supreme court said "we consider that automatic reversal is only required where an error is deemed 'structural' " (Glasper, 234 Ill. 2d at 197), they also

recognized that an instructional error may be "so severe that reversal is required, regardless of whether the error would be deemed structural under federal law." Glasper, 234 Ill. 2d at 199-200.

I believe that it is important to note that while Davis discussed plain error, the court actually did not hold that there was error committed by the trial court in that case. In Davis, the jury returned a guilty verdict for aggravated battery and a general verdict of guilty of first degree murder. The jury had been instructed on felony murder as well as intentional and knowing murder. On appeal, the defendant argued that it was reversible error to instruct the jury that felony murder could be predicated upon aggravated battery because the conduct forming the basis of the aggravated battery was inherent in the murder. Davis, 233 Ill. 2d at 247. The court first held:

> "[F]elony murder predicated on aggravated battery is a
>
> legally existent crime in Illinois. The Code of Criminal Procedure
>
> of 1961 expressly defines felony murder predicated on aggravated
>
> battery as a crime. See 720 ILCS 5/9-1(a)(3) (West 2006); 720
>
> ILCS 5/2-8 (West 2006). Moreover, this court in People v. Viser,
>
> 62 Ill. 2d 568, 580 (1975), held that felony murder predicated on
>
> aggravated battery is a valid and existing crime under nearly
>
> identical circumstances to the present case. Viser has never been
>
> overruled by this court, and was essentially reaffirmed by our most
>
> recent decision in this area in People v. Davis, 213 Ill. 2d 459, 475
>
> (2004)." Davis, 233 Ill. 2d at 269.

As pointed out in the majority opinion, Davis held that "the holding of Smith was conditioned on the trial court's refusal to grant a request [for a specific verdict form] and did not

establish a rule that the court must act *sua sponte* to give a specific verdict form." Davis, 213 Ill. 2d at 273. As Davis also did not find that a trial court has a duty to *sua sponte* give a specific verdict form, it was not error to not give one in Davis.

In People v. Piatowski, 225 Ill. 2d 551, 565 (2007), the court explained:

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regard-less of the closeness of the evidence."

As can be seen, the first factor which must be present before a reviewing court may consider an unpreserved error under either prong of plain error is "a clear or obvious error." The court in Davis never found any error much less "a clear or obvious error." The Davis court phrased their holding by saying "a plain-error analysis is appropriate, assuming *arguendo* that defendant is correct in his contention that a straightforward application of the one-good-count presumption would be faulty." (Emphasis added.) Davis, 233 Ill. 2d at 274. Further, the court held: "even if we were to find that a constitutional due process error occurred in instructing the jury on felony murder or that the one-good-count presumption is questionable, it would still not require automatic reversal of defendant's murder conviction. *** Accordingly we hold that the instant felony-murder instruction, even if erroneous, was a typical trial error that did not amount

to a structural defect that required automatic reversal. It would be analogous to the Apprendi cases that we have decided such as People v. Nitz, 219 Ill. 2d 400 (2006), and People v. Thurow, 203 Ill. 2d 352 (2003), where we found that the error of not submitting every essential element of an offense to the jury for consideration was subject to either a harmless error analysis if defendant made a trial objection or a plain-error analysis if defendant did not object." (Emphasis added.) Davis, 233 Ill. 2d at 273-74. The reason that Apprendi errors may amount to plain-error (note: under the first prong) is that the holding in Apprendi required that every essential element of an offense which could provide the basis for an enhanced sentence had to be submitted to the jury for consideration. Failure to do so was "a clear or obvious error." Again, no case has held that a trial court must provide specific verdict forms without being requested to do so.

In her dissent, Justice Theis posits that a " 'structural' error satisfies the second prong of the plain error test," and that this conclusion was supported by Davis only having addressed the first prong of plain error. Slip op. at 34-35. I believe that "structural error," as that term is used in both the federal context and in our supreme court's recent cases, is always reversible whether it arises in the "harmless error" or "plain error" context. Illinois follows the federal precedents in this area as elucidated in Gonzalez-Lopez, 548 U.S. at 149, 165 L. Ed. 2d at 420, 126 S. Ct. at 2564, but also includes the type of error found in Smith - the refusal by a trial court to provide specific verdict forms when requested to do so by a defendant. Smith, 233 Ill. 2d at 27-28; Glasper, 234 Ill. 2d at 192, citing Smith, 233 Ill. 2d at 25-26. Further, an instructional error may be "so severe that reversal is required, regardless of whether the error would be deemed structural under federal law." Glasper, 234 Ill. 2d at 199-200.

Our supreme court has long recognized these principles and has codified them in Supreme Court Rules 451(c) and 615(a). 210 Ill. 2d R. 451(c); 134 Ill. 2d R. 615(a). Rule 451(c) provides: "substantial defects are not waived by failure to make timely objections thereto if the interests of justice so require." 210 Ill. 2d R. 451(c) (first effective 1969). 210 Ill. 2d R.451(c); 134 Ill. 2d R. 615(a). Rule 651(a) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a) (first adopted in 1963).

Based on all of the above, I believe that the holding in <u>Davis</u> is controlling in this case and, as the trial court had no duty to *sua sponte* provide specific verdict forms for the first degree murder charge, there was no error in failing to do so.

1-07-0410

JUSTICE THEIS, dissenting:

Regarding the final issue raised by defendant, the majority finds that the trial court's failure to submit separate verdict forms to the jury for the different theories of first degree murder with which defendant was charged was not plain error. I respectfully disagree. I would find that the error here was the same as the error in Smith and that the error was a structural, serious error, which requires the court to vacate defendant's conviction and sentence for armed robbery, even though the issue was not raised below. I will also address the relationship between Davis and Smith, and the effect of Davis on Illinois plain error analysis.

In Smith, the defendants were convicted of first degree murder and armed robbery, and sentenced to consecutive terms of imprisonment for the crimes. Smith, 233 Ill. 2d at 5. The juries were instructed on intentional or knowing murder, felony murder predicated upon armed robbery, and armed robbery. Smith, 233 Ill. 2d at 5. The defendants requested separate verdict forms to distinguish the juries' findings on first degree murder, but the trial court denied their requests. Smith, 233 Ill. 2d at 5. On appeal, the defendants argued that the trial court abused its discretion when it denied their requests for special verdict forms because those forms were necessary to ensure that the defendants were sentenced properly. Smith, 233 Ill. 2d at 14. Specifically, the defendants pointed out that if the jury had found them guilty of felony murder, instead of intentional or knowing murder, they could not be convicted and sentenced for armed robbery. Smith, 233 Ill. 2d at 15.

The supreme court agreed, and held that where "specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion." Smith, 233 Ill. 2d at 23. The court further found that the trial court's

30

refusal to grant the defendants' requests for special verdict forms could never be harmless error. Smith, 233 Ill. 2d at 27-28. The court explained that because it was impossible to tell from the verdict whether the jury had convicted the defendants of intentional murder, and because the defendants were sentenced on the presumption that they were, the trial court's error in refusing the separate verdict forms that would have resolved this issue prejudiced the defendants. Smith, 233 Ill. 2d at 27-28. The court accordingly interpreted the verdict as finding the defendants guilty of only felony murder and, therefore, vacated the defendants' convictions and sentences for armed robbery. Smith, 233 Ill. 2d at 28-29.

Unlike Smith, in which the defendants were essentially challenging only their armed robbery convictions, the defendant in Davis challenged his first degree murder conviction. Specifically, in Davis, the defendant was convicted of first degree murder only. Davis, 233 Ill. 2d at 767. The jury was instructed on intentional or knowing murder and felony murder predicated on aggravated battery, and the jury returned a general guilty verdict of first degree murder. Davis, 233 Ill. 2d at 767. The defendant never requested a special verdict form. On appeal, the defendant contended that it was reversible error to instruct the jury that felony murder could be predicated upon aggravated battery because the conduct forming the basis of the aggravated battery was inherent in the murder. Davis, 233 Ill. 2d at 767. The defendant further argued that the one-good-count presumption, under which it was presumed that the general guilty verdict was one for intentional murder, was unconstitutional and should not apply. Davis, 233 Ill. 2d at 777-78.

The supreme court disagreed, and found that any error in instructing the jury was harmless. Davis, 233 Ill. 2d at 776. The court explained that the United States Supreme Court had recently resolved this issue in Pulido, 555 U.S. at ___, 172 L. Ed. 2d at 391, 129 S. Ct. at 532, and

31

concluded that where a jury returns a general guilty verdict after being instructed on alternative theories of guilt, but one of the alternative theories upon which the verdict could have been based was invalid, the error in so instructing the jury is not "structural" and is subject to harmless error analysis. Davis, 233 Ill. 2d at 780. The concept of "structural" error is a principle of federal error analysis.

Under federal criminal jurisprudence, not all constitutional errors require reversal. Pulido, 555 U.S. at ___, 172 L. Ed. 2d at 391, 129 S. Ct. at 532, citing Chapman v. California, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). The Court divides constitutional errors into two different categories: "trial errors" and "structural errors." United States v. Gonzalez-Lopez, 548 U.S. 140, 148, 165 L. Ed. 2d 409, 419, 126 S. Ct. 2557, 2563-64 (2006). Trial errors are those errors that " 'occurred during the presentation of the case to the jury' and their effect may 'be qualitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.' " Gonzalez-Lopez, 548 U.S. at 148, 165 L. Ed. 2d at 419,126 S. Ct. at 2563-64, quoting Arizona v. Fulminante, 499 U.S. 279, 307-08, 113 L. Ed. 2d 302, 330, 111 S. Ct. 1246, 1264 (1991). Most constitutional errors fall into the trial error category. Gonzalez-Lopez, 548 U.S. at 148, 165 L. Ed. 2d at 419, 126 S. Ct. at 2564. In contrast, structural errors " 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' " Gonzalez-Lopez, 548 U.S. at 148, 165 L. Ed. 2d at 419,126 S. Ct. at 2564, quoting Fulminante, 499 U.S. at 309-10, 113 L. Ed 2d at 330-31, 111 S. Ct. at 1264. Structural errors include the denial of the right to counsel, the denial of the right to self-representation, the denial of the right to a public trial, and the denial of the right to trial by jury resulting from the giving of a defective reasonable doubt instruction. Gonzalez-Lopez, 548 U.S. at 149, 165 L. Ed. 2d at 420,

126 S. Ct. at 2564. Thus, in Pulido, the Court found that the type of error claimed by the defendant in Davis was not a fundamental error and was subject to harmless error analysis. Pulido, 555 U.S. at ___, 172 L. Ed. 2d at 391, 129 S. Ct. at 532.

Our supreme court in Davis relied upon the holding of Pulido, recognizing that these types of errors "have now been specifically held by the United States Supreme Court to be subject to a harmless-error analysis and are not structural defects that require automatic reversal." Davis, 233 Ill. 2d at 781-82. The court thus held that even if it were to find that an error occurred in instructing the jury, in light of Pulido's holding, "it would still not require automatic reversal of defendant's murder conviction." Davis, 233 Ill. 2d at 781-82.

The court in Davis also distinguished Smith, finding Davis to be "a world away from Smith." Davis, 233 Ill. 2d at 781. The court specifically recognized that the defendant in Davis never objected to the general verdict and explained that "the holding of Smith was conditioned on the trial court's refusal to grant such a request and did not establish a rule that the court must act *sua sponte* to give a specific verdict form." Davis, 233 Ill. 2d at 781-82.

The majority seems to suggest that Davis overrules Smith insofar as Smith held that the refusal to allow a special verdict where it could result in an increased sentence for the defendant could never be harmless error. Indeed, the majority states that sentencing consequences were not the dispositive factor in Smith and goes on to rely upon pre-Smith cases such as Baker, Sample, and Griffin.

To the contrary, I would find that the possibility that a defendant could be subjected to increased punishment based upon the application of the one good count rule continues to be error, even after Davis. I believe that Davis does not overrule Smith but, rather, distinguishes it. Indeed, in its more recent decision in People v. Glasper, No. 103937, slip op. at 12 (June 18,

2009), the supreme court emphasized the continued validity of Smith. However, the court also made clear that the type of error involved in Smith was very specific. Glasper, slip op. at 12. The court also stated that contrary to the type of error involved in Davis, the error in Smith was a structural error. Glasper, slip op. at 12. The court explained that the error in Smith was that the defendant was denied his sixth amendment right to have a jury, rather than a judge, determine his guilt. Glasper, slip op. at 12. Such an error was not subject to harmless error analysis for two reasons: (1) because there was no actual jury verdict to review for harmless error; and (2) because the deprivation of the right to a jury verdict qualifies as a "structural" error. Glasper, slip op. at 12. Thus, the type of error involved in Smith continues to be error and continues to be an automatically reversible error not subject to harmless error analysis.

Additionally, I would find that Davis has altered the plain error analysis to be applied under Illinois law. In People v. Herron, 215 Ill. 2d 167, 186-87 (2005), our supreme court definitively held that "the plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either: (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." Thus, the focus of the second alternative was the "seriousness" of the error.

Then, in Davis, the supreme court imported the "structural defect" standard of federal constitutional harmless-error analysis into Illinois plain-error analysis. See Davis, 233 Ill. 2d at 782. Once the court in Davis concluded that the error in instructing the jury was not "structural", in conducting its plain-error analysis, the court considered only whether the evidence was closely balanced. Davis, 233 Ill. 2d at 782. It did not address whether the error was "serious." Davis, 233 Ill. 2d at 782.

This raises the question of whether a "structural" error automatically constitutes a "serious" error under Illinois plain error analysis.[1] As explained above, under federal jurisprudence, "structural" errors are so intrinsically harmful that they require automatic reversal; they are not subject to harmless error analysis. See, e.g., Neder v. United States, 527 U.S. 1, 7, 144 L. Ed. 2d 35, ___, 119 S. Ct. 1827, 1833 (1999). In People v. Lewis, No. 106306, slip op. at 12 (July 15, 2009), our supreme court explained that "[p]lain error marked by fundamental unfairness occurs only in situations revealing a breakdown in the adversary process as distinguished from typical errors," and that "plain error encompasses matters affecting the fairness of the proceeding and the integrity of the judicial process." Then, in Glasper, our supreme court explained that "automatic reversal is only required where an error is deemed 'structural,' i.e., a systemic error that serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " Glasper, slip op. at 16, quoting Herron, 215 Ill. 2d at 186. In Herron, the court used this same definition to describe the type of errors that would constitute plain error under the substantial rights prong of the test. Herron, 215 Ill. 2d at 186. The court specifically stated that "the substantial rights prong [of the plain error test] guards against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial." Herron, 215 Ill. 2d at 186.

---

[1]The United States Supreme Court has never decided whether a structural error would constitute a plain error. Puckett v. United States, ___ U.S. ___, ___, 173 L. Ed. 2d 266, ___, 129 S. Ct. 1423, 1432 (2009) (explaining that the Supreme Court has "several times declined to resolve whether 'structural' errors – those that affect 'the framework within which the trial proceeds,' [citations] – automatically satisfy the third prong of the [federal] plain-error test").

Because the second prong of the plain error test is satisfied where an error "erode[s] the integrity of the judicial process and undermine[s] the fairness of the defendant's trial," and a "structural" error is also defined as an error that "erode[s] the integrity of the judicial process and undermine[s] the fairness of the defendant's trial," I would find that a "structural" error satisfies the second prong of the plain error test and is always reversible. This conclusion is further supported by the fact that when the supreme court in Davis found the error was not "structural," it did not engage in any other analysis regarding whether the error would have satisfied the second prong of the plain error test. See Davis, 233 Ill. 2d at 782.

In summary, I would find that Smith, Davis, and also Glasper have changed Illinois error analysis in the following manner. First, regardless of whether the error was preserved or not, the court must ask whether there was, in fact, an error. See, e.g., Davis, 233 Ill. 2d at 273. Second, if there was error, the court must determine whether it was a "structural" error or a "trial" error. See Gonzalez-Lopez, 548 U.S. at 309-10, 165 L. Ed. 2d at 419, 126 S. Ct. at 2564. If the error was structural, then the court must automatically reverse. See Glasper, slip op. at 12; see also Smith, 233 Ill. 2d at 25 (explaining that the effect of the error in that case could not be measured by looking at the strength of the evidence). If the error was not structural, then the court's analysis of the impact of the error will depend on whether the error was properly preserved or not. See Herron, 215 Ill. 2d at 186-87. If the error was preserved, then the court will conduct a harmless error analysis, under which the State will bear the burden to persuade the court that the error did not affect the outcome of the trial. See, e.g., Smith, 233 Ill. 2d at 25. If the error was not preserved, then the court will conduct a plain error analysis, under which the defendant bears the burden to show that the evidence was closely balanced. See Davis, 233 Ill. 2d at 274; see also Herron, 215 Ill. 2d at 186-87. In this regard, I believe that, structural errors aside, the preservation

of the error affects only who has the burden of persuasion on the issue. See <u>Davis</u>, 233 Ill. 2d at 274.

Here, the majority failed to address whether the error was structural. It simply applied the analysis for "prejudice" under the first prong of plain error, found that the evidence was not closely balanced, and ended its analysis there. I believe that it should have found that the error was "structural," under <u>Smith</u> and <u>Glasper</u>. The error here was the same error as the error in <u>Smith</u> insofar as the defendant was denied the opportunity to have the jury determine whether he was guilty of intentional murder or felony murder, which resulted in a potentially erroneous consecutive sentence for armed robbery. See <u>Glasper</u>, slip op. at 12. Therefore, under <u>Smith</u>, I would find that it was reversible error for the court to have not given the jury special verdict forms. Accordingly, I would vacate defendant's conviction and sentence for armed robbery. See <u>Smith</u>, 233 Ill. 2d at 29. For these reasons, I respectfully dissent.