THIRD DIVISION
AUGUST 15, 2007

No. 1-05-2481

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 8865 |
| | ) | |
| SHEROME GRIFFIN, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant, Sherome Griffin, was convicted of first degree murder, armed robbery, two counts of aggravated kidnapping, and unlawful use of a weapon by a felon. Defendant was ultimately sentenced, as a result of a resentencing hearing, to a total of 42 years' imprisonment. On appeal, defendant contends that inadmissible prior consistent statements made by the State's key witness were improperly introduced and used to bolster the witness's testimony. Defendant additionally contends that his conviction and sentence for armed robbery must be vacated. Finally, defendant argues that the State impermissibly asserts that the trial court erred in imposing concurrent sentences in violation of section 5-8-4(a)(i) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(a)(i) (West 2002)).

Briefly stated, the evidence demonstrated that, on February 17, 2002, defendant, his brother, Andre, Sherrod Guy and Antonio Young forced the victim, Walter Gills, and his young son into a van at gunpoint. They restrained the victim, a known drug dealer, and stole items from his home and his mother's home, including two handguns, clothing and video game consoles.

While in his mother's garage, the victim attempted to flee, but was fatally shot. The victim's son was later found, unharmed. Thereafter, Anthony Thomas, defendant's longtime friend, learned the details surrounding the incident and eventually contacted the police. Thomas agreed to wear a hidden listening device for the police and then engaged defendant in a conversation regarding the incident. Defendant was subsequently arrested and provided a videotaped statement confessing his involvement in the offense. Prior to trial, the court denied defendant's motion to suppress the videotaped statement, finding that it was given voluntarily.

At trial, Thomas testified that defendant, defendant's brother, Guy and Young arrived at his house around 10:30 p.m. on the night of the victim's murder. The men initially asked to speak to Thomas's brother because they wanted him to sell some items that they obtained because they "hit a lick, and *** had to lay him down," meaning they robbed and murdered someone. Thomas's brother was not home; therefore, defendant asked Thomas to sell some of the stolen merchandise, which included a television, a radio, a Play Station video game console, two fur coats, clothes, a bullet-proof vest, and two handguns, a .38-caliber revolver and a .40-caliber automatic. Defendant then explained that the men had forced the victim and his son into a van at gunpoint, restrained the victim with duct tape and plastic zip ties and hit him while demanding money and drugs. The men subsequently drove the victim to a house and a garage, where they found drugs and took the above-listed items. While in the garage, the victim tried to escape; therefore, defendant told Thomas that he shot the victim twice with the revolver. Thomas admitted that he later sold the two handguns, one of the coats and the Play Station.

Thomas further testified that, in the spring of 2003, he and his brother were driving with

defendant when they passed an outdoor memorial picnic. They noticed that the attendees were wearing T-shirts marked with a picture of the victim, and defendant told them that the man pictured was the individual that he had robbed and murdered.

Thomas additionally testified that, in late 2003, while incarcerated for two pending offenses of which he was ultimately convicted, his cell mate was a friend of the victim. Thereafter, Thomas contacted detectives to disclose what he knew about the victim's murder because he felt it was "the right thing to do." Thomas subsequently agreed to wear an eavesdropping wire to further assist in the investigation. As a result, Thomas was released from jail and partook in a consensual overhear on March 11, 2004. Under the pretense that he had been placed on home monitoring, Thomas engaged defendant in a conversation about the robbery and the victim's murder. Thereafter, Thomas returned to jail and defendant was arrested one week later. After his arrest, defendant was placed in a holding cell with Thomas in an effort to obtain more information. Defendant, however, warned Thomas not to say anything and the men were eventually separated. Thomas ultimately served his sentence by completing boot camp.

The tape of the consensual overhear was published to the jury. On the tape, Thomas can be heard saying, "cause I know you, you – I know for sure you told me like, man, I murked [sic] dude with that mother----ing .38," to which defendant replied, "right." Defendant also stated that he did not have a .40-caliber automatic handgun but, rather, that he "used that sh---ing thing" because "[t]hat's [what] the revolver [is] for." The tape contained additional statements by Thomas regarding his cell mate, the fact that defendant told him he used the .38-caliber revolver in the offense and that Thomas sold the .40-caliber automatic handgun.

Detective James Washburn testified that defendant was arrested without incident on the morning of March 18, 2004. At 11:30 a.m., approximately one hour after his arrest, defendant was placed in an interview room and read his Miranda rights. Washburn then left to interview Guy, who had also been arrested that day. Guy eventually agreed to give a videotaped statement that evening. While Guy's interviews were ongoing, Washburn moved defendant into a holding cell with Thomas in an effort to gain information. Defendant was later returned to an interview room where he had continuous contact with various detectives. At 10:30 p.m., after again advising him of his Miranda rights, Washburn interviewed defendant. Initially, defendant denied having any knowledge of the victim's murder; however, when Washburn confronted him with fingerprint evidence found on the victim's van, defendant responded that he merely purchased marijuana from the victim on the day in question. Washburn subsequently played a portion of the consensual overhear tape, and defendant identified his voice. He then described what occurred, but denied that he was the shooter. The interview concluded shortly thereafter; however, Washburn later returned and told defendant that Guy identified defendant as the shooter. Defendant subsequently confessed to being the shooter and Washburn called an assistant State's Attorney (ASA). Washburn admitted that the police never recovered any proceeds from the theft in defendant's apartment.

ASA Timothy Carter testified that he interviewed defendant in Washburn's presence. The interview lasted approximately 45 minutes, and after it concluded, ASA Carter spoke to defendant alone about his treatment while in police custody. Defendant reported that he was treated fine. Defendant then chose to memorialize his statement by video. In the statement, which was

published to the jury, defendant reported that he, his brother, Guy and Young first approached the victim because Young wanted to purchase drugs. All four men eventually entered the victim's van and drove to his apartment. While in route, Young and the victim got into an argument over drugs, so Guy placed duct tape over the victim's mouth. The men found the .38-caliber revolver, coats, video games and a television in the apartment. However, when they did not find cocaine, the men removed the duct tape from the victim's mouth and he informed them that the drugs were at his mother's home. Defendant pointed the .38-caliber revolver at the victim as the men proceeded into the basement of the victim's mother's home. The victim retrieved cocaine from underneath a mattress and then brought them to the garage, where more cocaine and an assault rifle were located. The victim then tried to flee. Defendant warned him to stop running, but, when the victim refused, he was forced to shoot. Defendant further stated that he sold some of the stolen goods to Thomas.

Tamika Turner testified that, at the time of the offense, she lived with the victim and their 11-month-old son. After returning home from work, Turner learned that the victim had been murdered and discovered that her apartment had been ransacked. She reported that clothes, three coats, DVDs, the victim's handgun, two video game consoles and video games had been taken. Turner then identified two exhibits, her coat and a video game console, as items that had been stolen. She further testified that she did not know that the victim was a drug dealer and denied reporting to Washburn that $10,000 had been taken from underneath a mattress in the victim's mother's home.

Defendant testified that the victim was known as the "[s]treet [p]harmacist" and Young

and Guy sold drugs for him in the neighborhood. Defendant further stated that, on February 17, 2002, he purchased marijuana from the victim early in the day. A couple of days later, while at Young's house, Young and Guy informed defendant that they robbed the victim and killed him because they feared retaliation. They stated that the victim was killed because he was not "treating them right [by] not giving them a deal [on drugs]." Young explained that the victim's son was present when they robbed the victim, but that the baby was not harmed. Defendant further testified that Young asked him to sell some of the stolen goods, and defendant admitted that he sold the two handguns and a video game console. Defendant, however, denied selling a fur coat, asking Thomas to sell any coat, or speaking to Thomas on February 17, 2002. Rather, defendant stated that he contacted Charles Thomas, Thomas's older brother, and Charles assured defendant that he would have his younger brother sell the handguns and the video game console.

Defendant additionally testified that he was arrested in the spring of 2003 in connection with the victim's death. The police accused him of murdering the victim and told him that they had fingerprint evidence to support their claim; however, after being placed in two lineups and held at a police station for two days, defendant was released.

Then, on March 18, 2004, defendant was again arrested. Washburn notified defendant that he had spoken to defendant's brother, Guy and Young and all three men identified defendant as the victim's shooter. Defendant denied this and Washburn left the room, but returned periodically throughout the day. At some point, defendant was placed in a holding cell with Thomas; however, he did not speak to Thomas. Washburn then took defendant to another room where he played the taped conversation between himself and Thomas. Defendant admitted that he

was speaking on the tape, but stated that he was merely repeating information that he previously learned from Guy and Young in an effort to impress Thomas. Defendant testified that all of the statements he made to Thomas were false. Defendant admitted that he eventually told Washburn that he was involved in the victim's murder, but only because the police threatened his safety and further threatened to charge his brother as the shooter. As a result, defendant testified that he and Washburn devised a story which defendant then repeated to ASA Carter.

The jury ultimately found defendant guilty of first degree murder, armed robbery, two counts of aggravated kidnapping, and unlawful use of a weapon by a felon. The jury, however, found that defendant did not discharge the weapon that proximately caused the victim's death. Defendant was subsequently sentenced to a 50-year prison term for the murder count; a 28-year prison term for the armed robbery charge; a 25-year prison term for each of the aggravated kidnapping counts; and a 7-year prison term for the unlawful-use-of-a-weapon-by-a-felon count, all to run concurrently. Following a resentencing hearing, defendant's first degree murder sentence was reduced to 42 years' imprisonment and his armed robbery sentence was reduced to 25 years' imprisonment, with the remainder of the counts remaining unchanged and all counts still running concurrently. This timely appeal followed.

Defendant first contends that the trial court improperly introduced the consensual overhear tape between himself and Thomas because it contained hearsay, namely, prior consistent statements, which impermissibly bolstered Thomas's credibility as the State's witness. Defendant concedes that he failed to preserve this issue for appeal; however, he argues that the plain error rule permits its review. The State responds that defendant waived review of this claim and cannot

1-05-2481

demonstrate plain error where the consensual overhear tape was properly admitted as nonhearsay for the statements' effect on the listener and as defendant's adoptive admission.

To preserve an issue for appellate review, a defendant must object at trial and include the issue in a posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186-87 (1988). Despite forfeiture, a reviewing court may consider an error under the plain error rule when the trial evidence was closely balanced or when the error is "so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process." People v. Hall, 194 Ill. 2d 305, 335 (2000); see 134 Ill. 2d R. 615(a).

Application of the plain error rule assumes that an error occurred; therefore, as a threshold matter, we must determine whether the trial court erred in admitting the consensual overhear tape. The determination of whether evidence is admissible is a question within the sound discretion of the trial court and the decision will not be overturned absent an abuse of that discretion. People v. Williams, 181 Ill. 2d 297, 313 (1998).

The parties' dispute over whether Thomas's statements on the consensual overhear tape were hearsay incorrectly assumes that such statements are generally considered hearsay. It is well established that a taped conversation or recording, which is otherwise competent, material and relevant, is admissible so long as it is authenticated and shown to be reliable through proper foundation. People v. Harvey, 95 Ill. App. 3d 992, 1004-05 (1981), citing Belfield v. Coop, 8 Ill. 2d 293 (1956). Moreover, contrary to the parties' assumption, a taped conversation is not considered hearsay; instead, it is treated as a mechanical eavesdropper with an identity of its own, separate and apart from the voices recorded. Harvey, 95 Ill. App. 3d at 1005.

Defendant does not contest the competency, relevance, reliability or authenticity of the consensual overhear tape. On the contrary, the record demonstrates that defendant repeatedly identified his voice as one of the speakers on the tape. Moreover, the record also demonstrates that defendant did not object to the publication of the consensual overhear tape; rather, the parties agreed to stipulate to the accuracy of the accompanying transcript of the conversation, which was also entered into evidence. Accordingly, we find that the trial court did not err in admitting the tape. Consequently, defendant has waived review of this issue.

Defendant next contends that his armed robbery conviction is a lesser-included offense that must be vacated, along with the accompanying sentence, because it served as a predicate to his felony murder conviction. Defendant again concedes that he failed to preserve this issue for appeal; however, he argues that the plain error rule applies. The State initially responds that defendant waived review of this issue. In the alternative, the State argues that defendant's armed robbery conviction was proper.

Despite waiver, we review the merits of defendant's claim for plain error because it relates to his sentence and the "imposition of an unauthorized sentence affects substantial rights." People v. Hicks, 181 Ill. 2d 541, 544-45 (1998). Pursuant to the "one good count" rule announced by the supreme court in People v. Cardona, 158 Ill. 2d 403 (1994), "when an indictment contains several counts arising out of a single transaction and a general verdict is returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable." Cardona, 158 Ill. 2d at 411. Further, "when multiple convictions are obtained for offenses arising out of a single act, [a] sentence is imposed on the most serious offense." Cardona, 158 Ill. 2d at 411.

In the case at bar, the State charged defendant with first degree murder based on three theories, intentional murder (720 ILCS 5/9-1(a)(1) (West 2002)), knowing murder (720 ILCS 5/9-1(a)(2) (West 2002) and felony murder (720 ILCS 5/9-1(a)(3) (West 2002)). Without objection, the jury was given a general verdict form and then returned the form generally, finding defendant guilty of first degree murder. The evidence presented at trial was applicable to all three theories; therefore, the most serious first degree murder charge, intentional murder, was the proper basis for sentencing. See People v. Sample, 326 Ill. App. 3d 914, 929 (2001) (finding that armed robbery conviction and first degree murder conviction based on most serious theory charged were both proper where jury returned general verdict form and evidence supported both murder theories, intentional and felony murder). Consequently, although armed robbery is a lesser-included offense of felony murder, it is not a lesser-included offense of intentional murder. See Sample, 326 Ill. App. 3d at 929. Accordingly, defendant's armed robbery conviction and sentence were proper.

We are not persuaded by defendant's argument that, because a verdict was returned finding that he did not personally discharge the firearm causing the victim's death, the jury necessarily found him guilty of felony murder and not intentional or knowing murder. It is not this court's function to enter the minds of the jurors. Moreover, the jury's verdict is entitled to great deference and we find that the supreme court's firmly established rule that a defendant cannot "challenge convictions on the sole basis that they are legally inconsistent with acquittals on other charges" similarly applies to this claim. People v. Jones, 207 Ill. 2d 122, 133-34 (2003).

Furthermore, we respectfully find that People v. Smith, 372 Ill. App. 3d 762 (2007), a

case relied upon by defendant, is narrowly limited by its facts, which are distinguishable from the case at bar. The defendant in Smith was similarly charged with intentional, knowing and felony murder and the jury returned a general guilty verdict form. Smith, 372 Ill. App. 3d at 765. However, unlike our defendant, the defendant in Smith requested a separate verdict form for felony murder at both the informal and formal instruction conferences and also included the argument in a motion for new trial. Smith, 372 Ill. App. 3d at 765. All of his requests were ultimately denied and the lower court issued consecutive sentences for intentional murder and armed robbery. Smith, 372 Ill. App. 3d 765-66. On appeal, the fourth division of this court concluded that the trial court erred when it failed to grant the defendant's repeated requests for separate verdict forms and therefore modified his sentences to run concurrently. Smith, 372 Ill. App. 3d at 771-72. Essential to its determination was the fact that the lower court's failure to give the requested separate verdict forms may have contributed to the ultimate sentence because a finding of felony murder predicated on armed robbery would have prevented consecutive sentences. Smith, 372 Ill. App. 3d at 768-72. Here, there is no evidence that defendant requested separate verdict forms or even objected to the general forms. Moreover, the trial court imposed concurrent sentences; therefore, the fear at the heart of the Smith case did not exist. Accordingly, we find that defendant's armed robbery conviction was proper.

Finally, the State contends that the trial court erred in imposing concurrent sentences where section 5-8-4(a)(i) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(a)(i) (West 2002)) required consecutive sentences for at least some of his convictions. Consequently, the State requests that we remand this case for a new sentencing hearing. Defendant responds

that the State cannot assert such a request because it does not have the right to cross-appeal. In the alternative, defendant argues that consecutive sentences were not mandatory because the trial court failed to satisfy the requisite elements of section 5-8-4(a)(i) of the Code (730 ILCS 5/5-8-4(a)(i) (West 2002)).

At the outset, we note that we need not review whether the State has the right to appeal defendant's sentence because "[t]he appellate court ha[s] the authority to correct [a] sentence at any time." People v. Harris, 203 Ill. 2d 111, 118 (2003). If we conclude that the requisite elements of section 5-8-4(a)(i) of the Code (730 ILCS 5/5-8-4(a)(i) (West 2002)) were met, defendant's current sentence will be void for failing to conform with the mandatory language of the statute. Harris, 203 Ill. 2d at 118 (where the sentence is invalid, a reviewing court is not barred by the "rules limiting the State's right to appeal and prohibiting the appeal court from increasing a defendant's sentence on review"). We, therefore, review the merits of the State's claim.

The statute at issue states that a court shall impose consecutive sentences if "one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(a)(i) (West 2002). Therefore, first degree murder or any Class X or Class 1 felony acts as a "triggering" offense for the imposition of consecutive sentences if the defendant inflicted severe bodily injury during the commission of the offense.[1] People v. Carney, 327 Ill. App. 3d 998, 1001 n.1 (2002). A court

---

[1]This version of the statute become effective on January 1, 2000. Prior to the amendment, first degree murder was not a triggering offense. See Carney, 327 Ill. App. 3d at 1001 n.1.

1-05-2481

need not determine "whether the actions arose from separate courses of conduct or a single course of conduct" in order to issue consecutive sentences. Harris, 203 Ill. 2d at 116.

In the instant case, defendant was convicted of first degree murder, armed robbery and two counts of aggravated kidnapping, all of which are triggering offenses. See 720 ILCS 5/5-9-1(a)(1), 5-18-2(a), 5-10-2(a)(6), 5-10-2(a)(2) (West 2002). The acts supporting defendant's convictions were committed against one individual, with the exception of one of the aggravated kidnapping counts, and the victim's death clearly constitutes severe bodily injury. People v. Causey, 341 Ill. App 3d 759, 772 (2003) ("the death of the victim of a triggering offense can be the basis for a finding of severe bodily injury"). We, therefore, find that the trial court erred in imposing concurrent sentences in violation of the statute.

Accordingly, we affirm defendant's convictions but vacate the imposition of concurrent sentences and remand this case solely for the imposition of consecutive sentences pursuant to section 5-8-4(a)(i) of the Code.

Affirmed in part and vacated in part; cause remanded.

KARNEZIS, J., and CUNNINGHAM, J., concur.