**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 210575-U

Order filed December 31, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0575 Circuit No. 20-CF-663 |
| ONTARIO L. ALEXANDER, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Peterson concurred in the judgment.
Presiding Justice McDade concurred in part and dissented in part.

_____

**ORDER**

¶ 1    *Held*: (1) The defendant is not entitled to a new trial due to cumulative error, and (2) the defendant's posttrial statements regarding his counsel triggered the circuit court's duty to conduct a preliminary *Krankel* inquiry.

¶ 2    The defendant, Ontario L. Alexander, appeals his conviction for first degree murder arguing (1) he was denied his right to a fair trial on the basis of cumulative error, and (2) the Peoria County circuit court failed to conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 3                                    I. BACKGROUND

¶ 4        The defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and unlawful possession of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)). The evidence introduced at trial showed Roosevelt Hunter was shot outside the Landmark apartments in Peoria, the night of November 15, 2020.

¶ 5        The defendant initially waived his right to counsel and proceeded to a jury trial *pro se*. The counts were bifurcated, and two trials were held with the same jury. Prior to the defendant's testimony during the murder trial, the State requested the admission of the defendant's 2017 convictions for theft and aggravated battery. The court informed the defendant "if you're going to testify[,] the law allows your convictions within ten years to come in[,]" and that the theft conviction "definitely comes in." The defendant stated he understood and still wanted to testify. The court then heard arguments from the State and the defendant regarding the aggravated battery conviction and stated, "I'm going to let them both in ***." The jury was unable to reach a unanimous verdict on the first degree murder charge, and a mistrial was declared. The jury subsequently found the defendant guilty of UPWF.

¶ 6        Before the defendant's second trial for first degree murder, the court appointed defense counsel at the defendant's request. Defense counsel stated that the previous ruling regarding the admissibility of the defendant's prior convictions was the law of the case, and he would not relitigate the issue. Defense counsel further stated that "in the event [the defendant] does testify, I would be fronting those two convictions."

¶ 7        The case proceeded to jury selection. During *voir dire*, the court stated to several groups of potential jurors:

"Now I'm going to ask the four of you a battery of questions, and I'll just ask you to raise your hand if you agree with what I've said.

* * *

Do you accept and understand that the Defendant in a criminal case is presumed to be innocent of the charge against him?

All four raised their hand.

Do you accept and understand that before a defendant can be convicted the State must prove the Defendant guilty beyond a reasonable doubt?

All four raised their hand.

Do you accept and understand the Defendant is not required to offer any evidence on his own behalf?

All four raised their hand.

Do you accept and understand the Defendant's failure to testify cannot be held against him?

All four raised their hand."

Eleven of the 12 jurors were admonished this way.

¶ 8 The evidence at trial established that on November 15, 2020, Sergeant Robert McMillen responded to a call of shots fired at the Landmark apartments. McMillen located Hunter on the ground, who appeared to have been shot in the head and did not have a pulse. McMillen did not see anyone else in the area. Sergeant David Buss arrived at the scene and discovered several fired cartridge casings, and a "partial jacketing from a bullet" on "the chest of the deceased," and another "partial projectile" underneath the body. In total, Buss collected five shell casings.

¶ 9    Security footage from a nearby Shell gas station was played for the jury and showed a silver Chrysler minivan with no visible damage parked at a gas pump at 10:40 p.m. on November 15, 2020. The video showed Hunter, wearing a white sweatshirt, exit the front passenger seat, walk into the gas station, make a purchase, and return to the Chrysler, which drove away from the gas station at 10:43 p.m.

¶ 10    Black and white security footage from the Landmark apartments showed a white Saturn Relay van arrived at the complex at 11:01 p.m. Hunter, in the same white sweatshirt, exited the passenger seat, and then an individual in a dark hooded sweatshirt exited the driver's side. After a few moments, both individuals walked away from the Relay van and passed other parked vehicles. At 11:03 p.m., a flash appeared near the individuals and Hunter fell to the ground. Another flash occurred near the individuals shortly thereafter. The driver ran back to the Relay van and drove away. The Relay van had a temporary registration sticker on the top left side of the rear window. The sticker appeared folded at the bottom right. The Relay van's rear driver's side door was ajar. The footage showed police arriving at 11:07 p.m.

¶ 11    Detective Roberto Vasquez investigated leads based on the Landmark apartment's security video. Specifically, Vasquez discovered a Relay van with the same distinguishing features was registered to Anthony Brooks. The Chrysler was registered to Brooks's girlfriend. On November 17, 2020, officers located the suspected Relay van at a residence on West Augustana Street. An officer testified that he saw the defendant enter the residence and then leave in the Relay van. The police followed the Relay van to a residence on Millman Street where several officers continued surveillance. One of the surveilling officers later saw the defendant exit the front of the residence with two handguns. The defendant then went to the driver's seat of the Relay van and opened its hood before police converged on the defendant and took him into custody. There were two firearms

4

in plain view inside the Relay van, one was a silver 9-millimeter pistol with an extended magazine. An officer noted the Relay van had a temporary seven-day window sticker on the top left of the rear window, dents to the rear of the Relay van, and a sliding door on the driver's side that would not completely shut. The sticker appeared folded at the bottom right. A forensic scientist specializing in firearm identification testified that the five fired cartridge cases from Hunter's murder were fired from the silver 9-millimeter pistol recovered from the Relay van.

¶ 12    Police executed a search warrant of the defendant's home and seized a gray Nike sweatshirt from the defendant's bedroom. Defense counsel stated he had "no objection" to the admission of the photograph of the sweatshirt. The sweatshirt had a bloodstain on the sleeve. Forensic testing established the blood came from a woman. Defense counsel later stipulated to the admission of a different photograph of the sweatshirt and the laboratory results of the bloodstain showing it came from a woman.

¶ 13    Vasquez testified that he and Detective Hulse interviewed the defendant at the police station shortly after his arrest on November 17, 2020. The court admitted and published a redacted version of the video recorded interview. The defendant told the detectives that the residence on Millman Street where he was arrested was his mother's home. The defendant stated he did not know who owned the Relay van, but it belonged to someone he "hang[s] with," and "everybody" would drive it. Vasquez told the defendant he had talked to his mother, who said the defendant drove the Relay van "all the time," to which the defendant responded "Mm'hmm. Yeah."

¶ 14    The defendant told the detectives that, on the night of the murder, he was with his friends at the Cityscape apartments. Hunter, who was one of the defendant's best friends, arrived sometime that night. The defendant did not remember the exact time he left but knew he left in the Chrysler.

5

The defendant dropped one person off before taking another person back to the Cityscape apartments.

¶ 15 The defendant denied that the handguns in the Relay van were his and said that he did not know who they belonged to. He claimed they slid from underneath the seat when he arrived at his mother's house earlier that day. The defendant stated he had the Relay van since the night of the murder. He then admitted to taking the guns out of the van and into his mother's house for safekeeping because the Relay van's door did not work properly.

¶ 16 The defendant then stated that he returned the Chrysler to Brooks near the gas station. Hunter and the defendant walked to the Relay van, which was parked nearby at the defendant's cousin's house. As the defendant was driving Hunter to the Landmark apartments, the Relay van began to overheat so he dropped Hunter off one block south of the Landmark apartments before letting the Relay van cool off and driving it back to his mother's house, and eventually back to his house. The defendant denied going with Hunter in the Chrysler to the gas station or dropping off Hunter at the Landmark apartments.

¶ 17 Hulse then questioned the defendant's story, stating "to me, that doesn't make a lot of sense either. I mean, *** correct me if I'm wrong, but I mean you dropped [Hunter] off and the car was overheating. But then you drive from there all the way down to the 2200 block of Millman?" The defendant responded that he had to get home. Hulse responded, "so you can't drive another two blocks, but you can drive clear across [to the] 2200 block of Millman?" The defendant responded that it did not have to make sense to the detectives and that they already had their story. Hulse replied that it was not their story, they were just trying to make sense of what the defendant was telling them.

¶ 18    The defendant testified at trial that he had been convicted of theft and aggravated battery in 2017. He stated he did not kill Hunter and did not know who did. On the night of the murder, the defendant was with friends in the Chrysler, which the defendant believed belonged to Brooks. They went to the Cityscape apartments. The defendant left to purchase more alcohol. When he returned, Hunter had arrived. Later that night, Brooks requested that the defendant return the Chrysler. The defendant drove the Chrysler to drop off one friend before returning to the Cityscape apartments to drop off another. At that point, Brooks wanted the Chrysler returned immediately so the defendant dropped Hunter off one block south of the Landmark apartments sometime after 10:43 p.m. The defendant then returned the Chrysler to Brooks and walked back to where he previously parked the Relay van. The defendant took the Relay van to his mother's house on Millman Street. The lights in the house were turned off so the defendant went home. The Relay van remained there the next morning.

¶ 19    On November 17, the defendant went to the store, and took the Relay van to his mother's house. The police then arrived to arrest the defendant. The defendant testified that he realized the guns were there while driving to his mother's house because they "slid out," and he took them into his mother's house for "safekeeping."

¶ 20    The defendant also testified that he was not the only one who drove the Chrysler that night, and other people had access to both the Chrysler and Relay van. The defendant stated that someone else drove the Chrysler while he was at the Cityscape apartments and then returned it to him. The State asked whether the defendant recalled stating on May 26, 2021, under oath that he was driving the Chrysler "all night." The defendant testified that he did not recall previously stating that. As rebuttal evidence, the State presented a stipulation that the defendant stated under oath on May 26 that he was driving the Chrysler "all night."

7

¶ 21 During closing arguments, the prosecutor argued that the murder weapon was in the defendant's mother's house for 36 hours, and in rebuttal, argued the defendant's gray sweatshirt with blood on it was similar to the one the defendant was wearing when he shot Hunter. Defense counsel objected, arguing the video was in black and white, and the court overruled the objection. Later, the prosecutor argued the defendant's story was "complete nonsense."

¶ 22 The jury found the defendant guilty of first degree murder, and further found the defendant personally discharged a firearm during the offense. The defendant filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial, which was denied. At the sentencing hearing, the defendant gave a statement in which he asked, "why my public defender and the state's attorney withheld evidence from me[,]" and questioned why his counsel initially opposed a jury instruction pertaining to the gun enhancement but then later agreed to it. The court ultimately sentenced the defendant to 50 years' imprisonment with 3 years' mandatory supervised release (MSR) for first degree murder and 2 years' imprisonment with 1 year of MSR for UPWF to be served consecutively. The defendant appealed.

¶ 23                                    II. ANALYSIS

¶ 24 On appeal, the defendant argues he was deprived of a fair trial due to cumulative error based on: (1) the circuit court's failure to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (2) the interrogation video, which contained inadmissible hearsay; (3) the improper admission of the defendant's prior convictions; (4) the prosecutor's improper closing argument; and (5) the improper admission of the gray sweatshirt. The defendant also argues the court failed to conduct a preliminary *Krankel* inquiry despite the defendant complaining of his counsel at sentencing.

¶ 25                                 A. Cumulative Error

8

¶ 26 Whether the cumulative effect of multiple errors deprived the defendant of his due process right to a fair trial is a question of law that we review *de novo*. *People v. Radcliff*, 2011 IL App (1st) 091400, ¶ 22. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "However, the cumulative errors that warrant such an extreme result must themselves be extreme." *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. Under the cumulative error analysis, a new trial might be necessary even if the evidence of the defendant's guilt is overwhelming because the errors create a "pervasive pattern of unfair prejudice to defendant's case." *People v. Blue*, 189 Ill. 2d 99, 139 (2000).

¶ 27                                    1. Rule 431(b)

¶ 28 Rule 431(b) requires circuit courts to confirm that every potential juror accepts and understands four principles of law, including:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see also *People v. Zehr*, 103 Ill. 2d 472 (1984).

"[T]he plain language of the rule *** does not require the court to explain the *Zehr* principles to the jurors in any particular fashion." *People v. Birge*, 2021 IL 125644, ¶ 34. "Under the plain

language, a court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *Id.*

¶ 29 The rule does not require the court to seek a verbal response from each prospective juror or for the court to individually admonish each individual prospective juror. *Id.* ¶ 27. The rule only imposes "an affirmative duty on trial courts to *sua sponte* ask potential jurors whether they 'underst[and] and accept[ ] the [*Zehr*] principles.' " *Id.* ¶¶ 31, 4 (quoting *People v. Thompson*, 238 Ill. 2d 598, 618 (2010)) (no error where the court read all four principles in a single statement and asked the jurors "by a show of hands, do each of you understand these principles of law?").

¶ 30 The defendant argues that the court failed to comply with Rule 431(b) because it "[e]ssentially *** asked the jurors whether they agreed with a question. Expressing agreement with a question is not the same as answering the question." We disagree. The jurors were not asked to express agreement with a question, they were asked whether they agreed that they understood and accepted the *Zehr* principles of law. We do not see any material difference between a juror agreeing that they accept and understand the *Zehr* principles versus stating they accept and understand the principles, and the defendant has not provided us with any authority to the contrary. Instead, we maintain "[i]t would be imprudent to find error based solely upon the syntactical structure of a circuit court's questions." *People v. Lilly*, 2018 IL App (3d) 150855, ¶ 15.

¶ 31 Further, there is nothing in the record indicating the parties or jurors were confused by the court's admonishments. The *Zehr* principles are "concepts that are familiar to the average layperson and relatively easy to understand." *Birge*, 2021 IL 125644, ¶ 40. We, therefore, do not believe the "purpose of the rule [was] thwarted" by the court's method of admonishment. *Id.* ¶ 41.

¶ 32 2. Improper Hearsay in Interrogation Video

10

¶ 33        The defendant next contends that the redacted interview video admitted at trial improperly contained two hearsay statements: Hulse's statements that the defendant's story did not make sense, and Vasquez's statement that the defendant's mother told the officers that the defendant drove the Relay van "all the time." "Hearsay is defined as 'testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter.' " *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007) (quoting *People v. Rogers*, 81 Ill. 2d 571, 577 (1980)). Hearsay evidence is generally inadmissible because there is no opportunity to cross-examine the declarant. *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). However, "a statement offered for some reason other than for the truth of the matter asserted therein is generally admissible." *Evans*, 373 Ill. App. 3d at 964.

¶ 34        "A taped conversation is not hearsay; rather, it is a 'mechanical eavesdropper with an identity of its own, separate and apart from the voices recorded.' " *People v. Theis*, 2011 IL App (2d) 091080, ¶ 32 (quoting *People v. Griffin*, 375 Ill. App. 3d 564, 571 (2007)). "It is well established that a taped conversation or recording, which is otherwise competent, material and relevant, is admissible so long as it is authenticated and shown to be reliable through proper foundation." *Griffin*, 375 Ill. App. 3d at 570. Further "statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response." *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35.

¶ 35        Neither statement was hearsay because both statements were part of a recorded interrogation, and their admissions were necessary to explain the defendant's responses. Vasquez stated the defendant's mother said the defendant drove the Relay van "all the time," and the defendant agreed, saying, "Mm'hmm. Yeah." It would be impossible to decontextualize the

11

defendant's agreement with Vasquez's statement from Vasquez's statement itself. Vasquez's statement was therefore necessary to explain the defendant's response. Hulse's statements regarding the defendant's story were also not hearsay. The defendant's story during the interrogation was that he dropped Hunter off a few blocks from the Landmark apartments because the Relay van was overheating, and the defendant needed to return home. The defendant was then unable to explain why he could drive the Relay van to Millman Street but could not drive it two blocks to drop off Hunter at the Landmark apartments, even though the Relay van is seen on the security footage from the Landmark apartments. Without Hulse's statements, the decontextualized responses from the defendant would be nonsensical and would likely leave the jury confused and forced to fill in the blanks. Because the statements were not hearsay, they were properly admitted.

¶ 36                                3. Prior Convictions

¶ 37        Next, the defendant argues the circuit court erred in admitting the defendant's prior convictions of theft and aggravated battery without conducting the *People v. Montgomery*, 47 Ill. 2d 510 (1971), balancing test. Alternatively, the defendant argues that, even if the court conducted the appropriate *Montgomery* test, the aggravated battery conviction should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice. "A trial court's decision to enter a defendant's prior conviction into evidence for purposes of impeachment will not be disturbed absent an abuse of discretion." *People v. Melton*, 2013 IL App (1st) 060039, ¶ 17. "The trial court is to be given wide latitude in exercising this discretion." *People v. Grengler*, 247 Ill. App. 3d 1006, 1014 (1993).

> "Under the *Montgomery* rule, evidence of a witness' prior conviction is admissible to attack the witness' credibility where: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement

12

regardless of the punishment, (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later, and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice." *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999).

¶ 38 The defendant argues the court did not conduct the *Montgomery* balancing test here. However, "[a] trial judge is presumed to know the law, and a reviewing court will ordinarily presume the trial judge followed the law unless the record indicates otherwise." *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43. The record here demonstrates the court understood and applied the law appropriately. The court asked the date of the offenses, both of which were committed in the last 10 years, and invited more argument as to the aggravated battery conviction. See *People v. Robinson*, 299 Ill. App. 3d 426, 441 (1998) ("Crimes of dishonesty that satisfy the second prong of the *Montgomery* test are admissible, as they are probative of truthfulness."). Given the wide latitude afforded to circuit courts in admitting prior convictions, we find the court properly admitted the defendant's prior convictions. See *People v. Williams*, 173 Ill. 2d 48, 83 (1996) (even though the circuit court did not expressly say so, the court properly applied the *Montgomery* balancing test in admitting the defendant's prior conviction of aggravated battery at his trial for attempted murder, murder, and aggravated battery with a firearm).

¶ 39                                   4. Prosecutor's Closing Argument

¶ 40 Next, the defendant argues the prosecutor made an improper closing argument when it stated the murder weapon was in the defendant's mother's house for 36 hours following the murder. As a general rule, "prosecutors have wide latitude in the content of their closing arguments." *People v. Jackson*, 2020 IL 124112, ¶ 82. Prosecutors may comment on both the evidence itself, as well as "on any fair and reasonable inference the evidence may yield, even if

13

the suggested inference reflects negatively on the defendant." *Id.* The statement that the weapon was in the defendant's mother's house for 36 hours following the murder was a reasonable inference supported by the evidence and therefore not improper. The defendant admitted to driving the Relay van to his mother's house the night of the murder to allow it to cool off. Roughly 36 hours later, the defendant was then spotted walking out of his mother's home with two firearms, including the murder weapon. The inference that the defendant dropped off the murder weapon at his mother's home following the murder, then picked it up 36 hours later in the Relay van was supported by the defendant's own admissions. The prosecutor's statement was, therefore, not improper.

¶ 41                                  5. Gray Sweatshirt

¶ 42          The defendant next argues the gray sweatshirt with a woman's bloodstain on the sleeve should not have been admitted into evidence. Generally, all relevant evidence is admissible, and evidence that is not relevant is not admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Physical evidence must be connected to both the defendant and the crime to be admissible. *People v. Allison*, 236 Ill. App. 3d 175, 192 (1992). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 43          Even if we were to accept the defendant's contention that admitting the sweatshirt and laboratory results was error, the defendant is not entitled to a new trial because we have found no error in the defendant's other issues on appeal. "The doctrine of cumulative error cannot be applied when there is only one error." *People v. Medley*, 111 Ill. App. 3d 444, 450 (1983). This issue was

14

forfeited, and the defendant does not argue this error alone warrants reversal. Further, a new trial due to cumulative error is only appropriate where multiple errors "create a pervasive pattern of unfair prejudice to the defendant's case," which did not occur here. *Howell*, 358 Ill. App. 3d at 526; see, *e.g.*, *People v. Mays*, 2023 IL App (4th) 210612, ¶ 114 (though "some mistakes were made in defendant's trial, *** these errors neither individually prejudiced defendant nor created a pervasive pattern of unfair prejudice to defendant").

¶ 44                                B. Preliminary *Krankel* Inquiry

¶ 45        The defendant alternatively argues we should remand this matter for a preliminary *Krankel* inquiry because the defendant complained of his trial counsel during allocution. We consider *de novo* a circuit court's alleged failure to inquire into a claim of ineffective assistance of counsel. *People v. Bates*, 2019 IL 124143, ¶ 14. A defendant has the constitutional right to the effective assistance of counsel. U.S. Const. amends., VI, XIV; Ill. Const. 1970, art. I, § 8. If a defendant raises a *pro se* posttrial claim that he was denied his constitutional right to the effective assistance of trial counsel, the court must inquire further into defendant's allegations. *Krankel*, 102 Ill. 2d at 189; *People v. Roddis*, 2020 IL 124352, ¶ 34. "Hearing those claims is a two-step process: (1) the circuit court makes a preliminary inquiry to examine the factual basis of the defendant's claim and (2) if the allegations show 'possible neglect of the case,' new counsel is appointed to represent the defendant in a full hearing on his *pro se* claims." *People v. Horman*, 2018 IL App (3d) 160423, ¶ 24 (quoting *People v. Moore*, 207 Ill. 2d 68, 78 (2003)).

¶ 46        The defendant only needs to bring the claim to the court's attention to trigger a preliminary inquiry. *Id.* "The applicable standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* posttrial claims of ineffective assistance of counsel." *Jackson*, 2020 IL 124112, ¶ 98. "[W]hen a defendant brings a clear claim asserting ineffective

15

assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *People v. Ayres*, 2017 IL 120071, ¶ 18. " '[A] defendant does not need to explicitly label his claim as one of ineffective assistance of counsel. *** [I]t is sufficient for a defendant to alert the court that counsel failed to do something that should have been done.' " *In re Johnathan T.*, 2022 IL 127222, ¶ 53 (quoting *People v. Banks*, 2021 IL App (5th) 190129-U, ¶ 30 (Wharton, J. dissenting)). Here, the defendant asked why counsel withheld evidence from him and questioned why counsel later agreed to a jury instruction after initially opposing it. The defendant was clearly complaining of his counsel's performance and their failure to do something that should have been done, which we believe triggered the court's duty to conduct a preliminary *Krankel* inquiry. We therefore remand this matter for a preliminary *Krankel* inquiry.

¶ 47                                     III. CONCLUSION

¶ 48         The judgment of the circuit court of Peoria County is affirmed and remanded.

¶ 49         Affirmed and remanded.

¶ 50         JUSTICE McDADE, concurring in part and dissenting in part:

¶ 51         I am confounded by the majority's rejection of defendant's claim of cumulative error and respectfully dissent from that portion of its order. The majority's fatal error stems, at least in part, from its reliance on a faulty premise based on its misunderstanding of cumulative error.

¶ 52         Here, defendant raises several claims of error on appeal, most of which the majority dismisses essentially out-of-hand, with little analysis. Before I address some of those specific claims, however, I must first correct the majority's internally inconsistent recitation of the standard to be applied when considering a claim of cumulative error. *Supra* ¶ 26. Notably, the majority's first and fourth statements reasonably set out the correct parameters of cumulative error: while smaller errors may not warrant reversal individually, they may, nonetheless, add up

16

to create a pattern of mischief that undermines the fundamental integrity of the verdict, thus requiring reversal and a remand for a new trial. After correctly laying out that understanding of cumulative error, however, the majority then directly contradicts those standards in statements two and three, stating instead that each error must be "extreme" and that the alleged error must be "reversible *** on any individual issue" to constitute cumulative error. *Id.* That exposition says that cumulative error may be found when the individual errors at issue are both insufficient *and* sufficient to rise to the level of reversible error. If an error is reversible, however, it is sufficient, by itself, to mandate reversal; no need to rely on cumulative error exists. Because the inconsistent framework posited by the majority could effectively be used to justify virtually any trial court decision, I cannot join in the majority's adoption of that view.

¶ 53    Turning to the merits of defendant's individual claims, I initially note that the four *Zehr* principles involved in the first issue on appeal constitute the heart of our adversarial system of justice. Indeed, they constitute the very rules of the system by which we determine guilt or innocence. *Blue*, 189 Ill. 2d at 138. For that reason, courts must scrupulously apply the standards for ensuring that jurors have been properly questioned about their understanding and acceptance of each of those principles to ensure a just result.

¶ 54    In *Birge*, our supreme court considered whether Supreme Court Rule 431 required trial courts to recite each of the four *Zehr* principles individually when questioning potential jurors. *Birge*, 2021 IL 125644, ¶ 34. The trial court there had stated all four principles at one time before proceeding to query groups of prospective jurors with two separate questions about whether they (1) understood those principles and (2) accepted them. *Id.* ¶¶ 4, 6. Here, the trial court asked jurors about each of the principles separately. Because the precise question before the supreme court was different from the one at issue here, its precise holding in *Birge* does not control our

17

discussion. What does directly impact this court's analysis, however, is the *Birge* court's explanation of the three individual steps that all trial courts must undertake to comply with Rule 431. That analysis strongly suggests that here the questions asked by the trial court failed to rise to the level of the protections mandated in Rule 431.

¶ 55    In *Birge*, our supreme court provided a concise and unambiguous model of the three steps that a trial judge must follow to satisfy the demands of Rule 431 when questioning jurors regarding the *Zehr* principles that form the basis for our system of justice. *Birge*, 2021 IL 125644, ¶ 34. As directed in *Birge*, "[u]nder the plain language, a court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *Birge*, 2012 IL 125644, ¶ 34. The majority correctly cites that binding precedent with approval. *Supra* ¶ 28.

¶ 56    In the instant case, however, the trial court did not adhere to those three steps, instead collapsing steps two and three into a single compound question that it successively asked groups of jurors: whether they both understood *and* accepted each of the *Zehr* principles. Our supreme court has long recognized the critical relationship between the form of a question and its propriety and has expressly rejected the use of compound questions due to the high risk of misunderstanding. As the court noted in *People v. Franklin*, 135 Ill. 2d 78, 96 (1990), "the question originally put to [the witness] about the speed of the car was *a compound one*. Hence, the circuit court properly sustained the State's objection. (See, *e.g.*, *People v. Rossini*, 25 Ill. 2d 617, 621 (1962) (*questions must be asked in their proper form*).) Defense counsel made no attempt to rephrase the *objectionable question*." (Emphases added.)). Similarly, the Handbook of

18

Illinois Evidence also explained the reasons why the use of compound questions is erroneous, noting that

> "[a] question is objectionable as compound if it contains two or more questions. A compound question increases the risk of inaccuracy, since the witness may be confused by the question. Moreover, the answer of the witness may be ambiguous if it is hard to determine which question is being answered. To illustrate, the question 'Did you go to the store or did you go to the park?' is *a compound question to which an intelligible yes or no answer cannot be made*." (Emphasis added.) E. Cleary & M. Graham, Handbook of Illinois Evidence § 611.20, at 658 (10th ed. 2024).

Those fundamental concerns apply to the instant case as well.

¶ 57 Here, rather than asking jurors if they understood a specific *Zehr* principle in one question and then asking if they accepted that principle in another, the trial court asked jurors whether they both understood and accepted the principle in a single compound question, repeating that format for each of the four principles. The likelihood of misunderstanding in that scenario is readily apparent. Common experience suggests that, while an individual may understand an idea, that individual may be unwilling to accept the application of that idea in a specific instance. Thus, inquiries into whether a juror, first, understood one of the *Zehr* principles and, second, actually accepted the application of that principle could easily result in disparate answers.

¶ 58 By posing a series of compound questions to 11 of 12 prospective jurors on whether they both accepted and understood each of the *Zehr* principles, the trial court created a scenario in "which an intelligible yes or no answer cannot be made." See Cleary & Graham, Handbook of Illinois Evidence § 611.20, at 658. Thus, the form of the court's questioning was clearly

19

erroneous. Because those four principles are foundation for our determination of guilt or innocence (*Blue*, 189 Ill. 2d at 138), the trial court's flawed questioning rises to the level of reversible error, requiring this court to reverse defendant's first-degree murder conviction and remand the cause for a new trial. Because, however, the majority does not find reversible error, I next consider its rulings on other issues raised by defendant on appeal, starting with his claim that his interrogation video improperly admitted two prejudicial hearsay statements.

¶ 59        Initially, I sharply dissent for two reasons from the majority's statement that "[n]either statement [by officers Vasquez and Hulse] was hearsay because both statements were part of a recorded interrogation, and their admissions were necessary to explain the defendant's responses." *Supra* ¶ 35. First, it is inconceivable that law enforcement could immunize any and all statements tending to show a defendant's culpability simply by including them in a recorded interrogation. That would effectively give police *carte blanche* to get inadmissible evidence before any jury by injecting it into a recorded interview. The scope of the majority's contrary assertion, based on language quoted from *Theis*, 2011 IL App (2d) 091080, ¶ 32, and *Griffin*, 375 Ill. App. 3d 564, 571, is far too sweeping. *Supra* ¶¶ 34-35.

¶ 60        While it is certainly true that the mere fact that a recording is at issue does not immediately disqualify it as inadmissible hearsay, that conclusion is a far cry from the majority's immunization of any and all statements contained on a recording from ever being deemed to be inadmissible hearsay. The basis of the majority's error lies in its blind reliance on statements borrowed from *Theis*, 2011 IL App (2d) 091080, ¶ 32. Those broad generalizations, however, offer no valid legal support for the majority's view because they are strictly *obiter dicta*. The issue of the validity of the hearsay alluded to by the *Theis* court was not actually before the court because there the "[d]efendant *concede[d] that his statements were admissible as an exception to*

20

*the hearsay rule*." (Emphasis added.) Thus, the discussion in *Theis* was not supported by any legal precedent and cannot offer a valid legal basis for the majority's conclusion here. See *People v. Lighthart*, 2023 IL 128398, ¶ 50 (stating "*obiter dictum*, as it was not essential to the outcome of the case, is not an integral part of the opinion, and thus is not binding authority or precedent within the *stare decisis* rule).

¶ 61 Moreover, the court in *People v. Collins*, 2020 IL App (1st) 181746, ¶ 41 (as modified (July 26, 2021)), has examined the relevant supporting legal authority for the  propositions stated in both *Theis* and *Griffin* and found it completely wanting. The decision in *Collins* recognized that neither *Theis* nor *Griffin* can be reconciled "with the earlier cases on which they purport to rely. *Theis* relied on *Griffin*, which in turn relied on *People v. Harvey*, 95 Ill. App. 3d 992, 1004-05 (1981) ('The recording *** is not treated as hearsay but as a mechanical eavesdropper ***.'). *Harvey* pulled the 'mechanical eavesdropper' rule from *Belfield v. Coop*, 8 Ill. 2d 293 (1956), but examining *Belfield*, we see its rule *had nothing to do with hearsay*." (Emphasis added.) Thus, the rationale underlying the discussions from *Theis* and *Griffin* that were relied on by the majority has no valid legal basis.

¶ 62 In addition, the majority attempts to apply another faulty rationalization to validate Vasquez's reference to the mother's hearsay statement by relying on the defendant's response to that statement. The majority claims that the statement that "the defendant drove the Relay van 'all the time' ", "would be impossible to decontextualize *** from Vasquez's statement itself. Vasquez's statement was therefore necessary to explain the defendant's response statement." *Supra* ¶ 35.

¶ 63 By presenting the mother's out-of-court statement that defendant drove the Relay van "all the time" by way of the recording, the statement was offered for the facts being stated, making it

21

hearsay. The inculpatory hearsay statement was clearly intended to rebut defendant's assertion that other people had been driving the vehicle prior to the shooting. See *Evans*, 373 Ill. App. 3d at 964 (quoting *Rogers*, 81 Ill. 2d at 577)) (stating "[h]earsay is defined as 'testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter' "). The inclusion of hearsay statements necessarily impacts a defendant's constitutional rights. After all, "[t]he primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974).

¶ 64    If overcoming the constitutional protections that the hearsay rule was designed to ensure merely requires the presence of some subsequent utterance, however generic, then the rule itself, and the protections it seeks to uphold, have largely been rendered nullities. In virtually every case, the inherent interconnection between a statement and a subsequent response makes it virtually impossible to decipher that response without knowing the comment that triggered it. That is particularly true here, where defendant's response was decidedly ambiguous, stating " 'Mm'hmm. Yeah.' ". *Supra* ¶ 35. Because the protections provided by the hearsay rule cannot properly be overcome so easily, I dissent from that analysis and would find that the admission of Vasquez's statement constituted error, although it did not rise to the level of reversible error.

¶ 65    Finally, I also cannot adopt the majority's view regarding the trial court's admission of photos of the blood-stained gray sweatshirt. That analysis consists solely of a broad exposition of the legal standards for relevant evidence that are stated in Illinois Rule of Evidence 403. The majority fails, however, to address the application of that evidentiary rule, which expressly states that "[r]elevant evidence 'may be excluded if its probative value is substantially outweighed by

the danger of unfair prejudice.' Ill. R. Evid. 403 (eff. Jan. 1, 2011)." *Supra* ¶ 42. Here, the application of that portion of the rule is key to the proper resolution of this case. The majority avoids that analysis, however, by relying instead on its view of cumulative error, stating

> "[e]ven if we were to accept the defendant's contention that admitting the sweatshirt and laboratory results was error, the defendant is not entitled to a new trial because we have found no error in the defendant's other issues on appeal. 'The doctrine of cumulative error cannot be applied when there is only one error.' *People v. Medley*, 111 Ill. App. 3d 444, 450 (1983)." *Supra* ¶ 43.

Because I conclude that defendant's trial contained multiple errors with constitutional significance, I will address on its merits the question of whether the probative value of the blood-stained sweatshirt "is substantially outweighed by the danger of unfair prejudice" (Ill. R. Evid. 403 (eff. Jan. 1, 2011)).

¶ 66        It is undisputed that the Landmark security video footage showing the shooter wearing what appeared to be a hooded sweatshirt was far from definitive evidence of defendant's involvement in the shooting. Because the footage was black and white, it failed to register the actual color of the sweatshirt, capturing the scene only in shades of black, white, and gray. The only descriptive elements of the sweatshirt reliably shown in that footage are that it had a hood and was not black or white. In contrast, the sweatshirt in the photos admitted at trial possessed a number of distinctive characteristics that were absent from the sweatshirt shown in the video footage. The sweatshirt in the photos had a zipper, making it more like a jacket than a simple pullover sweatshirt, and displayed a Nike logo on one side. Critically, it also had a red stain on the right sleeve that was not visible on the shooter's sweatshirt. The only similarities between the two clothing items were that they both had hoods and were not white or black. Thus, while the

23

sweatshirt jacket in the photos may, indeed, have been relevant to the issues in the case, its probative value was quite low due to those extremely limited similarities and the fact that sweatshirts in general are commonly possessed articles of clothing.

¶ 67　　　　After finding the relevance of the photos, however, the majority declines to reach the second prong of the analysis mandated in Rule 403. That prong states, "Relevant evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.' Ill. R. Evid. 403 (eff. Jan. 1, 2011)." *Supra* ¶ 42.

¶ 68　　　　Here, the risk of prejudice from the State's showing that the sleeve of defendant's sweatshirt jacket was stained with blood was extremely high. Indeed, it is difficult to imagine a jury's ultimate determination of guilt or innocence not being seriously impacted by evidence that the alleged shooter possessed a sweatshirt that was visibly stained with the blood of some unknown woman. The likelihood of undue prejudice was even higher here, in a murder case, because the trial court also admitted evidence that defendant had previously been convicted of aggravated battery, a violent felony. Moreover, the State unduly emphasized the importance of the sweatshirt jacket in its closing argument when it characterized, over defendant's objection, the jacket as "a gray hooded sweatshirt just like the Defendant was wearing when he got out of the van." Not only did that claim state as fact that defendant was the shooter shown getting out of the van in the Landmark footage, which was the ultimate question in the case, it also vastly overstated the similarities between the shooter's sweatshirt and defendant's sweatshirt jacket by stating one was "just like" the other. The evidence adduced by the State at trial did not support that prejudicial conclusion.

¶ 69　　　　Applying the balancing test in Rule 403, the inherently low probative value of the photos admitted of the sweatshirt jacket was far "outweighed by the danger of unfair prejudice" that the

blood-stained jacket would have on the jury. Accordingly, this court should find that the admission of the photos of the sweatshirt jacket was an abuse of the trial court's discretion.

¶ 70      In sum, the fairness of defendant's trial was seriously undermined by several significant errors, all of which implicated core constitutional protections: (1) the trial court's inadequate admonition on the four *Zehr* principles that form the basis for our system of criminal justice, in violation of Rule 431; (2) the admission of Office Vasquez's taped recounting of hearsay statements refuting defendant's account of his actions; and (3) the admission of unduly prejudicial photos, contrary to the protection offered by Illinois Rule of Evidence 403. Even if not sufficient to constitute reversible error when viewed individually, the cumulative effect of those errors "create[s] a pervasive pattern of unfair prejudice to the defendant's case," requiring a new trial on the basis of cumulative error. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). See *Supra* ¶ 26 (stating the correct test for cumulative error). For that reason, I respectfully dissent from the portion of the majority's order addressing those erroneous rulings. Because I agree with the majority's conclusion that a preliminary *Krankel* inquiry was warranted, however, I join in that portion of the majority's decision.